Commonwealth *v.* Clopton, Appellant.

Argued November 16, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Jeffry A. Mintz,* Assistant Defender, with him *John W. Packel,* Assistant Defender, and *Vincent J. Ziccardi,* Defender, for appellant.

*J. Bruce McKissock,* Assistant District Attorney, with him *Edward B. Greene* and *Milton M. Stein,* Assistant District Attorneys, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, March 21, 1972:

James Clopton was convicted after a nonjury trial in Philadelphia of: (1) attempted murder; (2) assault and battery; and (3) unlawfully carrying a firearm

without a license.[1] Following the denial of post trial motions, a prison sentence was imposed on each indictment; the sentences to run consecutively. On appeal the Superior Court affirmed the judgments without opinion, with Judges MONTGOMERY and HOFFMAN dissenting. 217 Pa. Superior Ct. 783, 269 A. 2d 365 (1970). We granted allocatur.

The trial testimony established the following facts.

Clopton, a resident of Oklahoma, came to Philadelphia for the purpose of killing Billy Lee Riner, for which he was to be paid $1,000; about 3 a.m. on December 2, 1969, Clopton and James Sumpter entered Riner's apartment and told him he was going to be killed; Clopton struck Riner three times with a shotgun and forced him at gunpoint to accompany the intruders to a waiting automobile operated by John Lauderdale; Riner was placed in the front seat between Clopton and the driver; the former held a pistol to Riner's side while Sumpter sat in the back seat armed with a shotgun; after the automobile traveled a few blocks during which Clopton again indicated it was the intention to kill Riner, the latter grabbed Clopton's pistol by the barrel and in an ensuing struggle managed to grab the steering wheel swerving the automobile, and to gain possession of the pistol from Clopton; Riner then fatally shot Sumpter and Lauderdale and pistol-whipped Clopton; the police arrived on the scene shortly thereafter.

The only assignment of error now asserted challenges the legality of Clopton's conviction of and sentence for the crime of attempted murder.

Pennsylvania statutes contain two provisions specifically dealing with the crime of attempted murder. The Act of June 24, 1939, P. L. 872, §710, 18 P.S. §4710, the

---

[1] Clopton was found not guilty of conspiracy and assault and battery with intent to kill.

basis of one of the indictments of which Clopton was acquitted, prohibits "assaults with intent to kill". This statute provides that: "Whoever administers, or causes to be administered by another, any poison or other destructive thing or stabs, cuts or wounds any person, or by any means causes any person bodily injury, dangerous to life, with intention to commit murder, is guilty of felony. . . ." This statute was clearly inapposite herein since the superficial injuries (ones certainly not dangerous to life) sustained by Riner were not inflicted with the intent to commit murder, but merely to force him to the place where such a homicidal wound could be inflicted.

The other statutory provision is entitled "Attempts with intent to kill", Act of June 24, 1939, P. L. 872 §711, 18 P.S. §4711 (hereinafter 18 P.S. §4711). This section punishes, as a felon: "Whoever attempts to administer any poison or other destructive thing, or attempts to cut or stab or wound, or shoots at any person, or, by drawing a trigger or in any other manner, attempts to discharge any kind of loaded arms at any person, or attempts to drown, suffocate or strangle any person, with intent to commit the crime of murder, although no bodily injury is effected. . . ." Maximum penalty under the statute is seven years imprisonment. To violate this provision when a gun is the criminal instrumentality, the accused must have actually pulled the trigger, and one who stops as he is preparing to shoot, even with the requisite specific intent, cannot be validly convicted under this section of the statute.[2] Thus the

---

[2] English cases under the Statute of Victoria, C. 85, §3 (later reenacted as s. 14 of 24 and 25 Victoria C 100) from which our own Attempt with intent to kill statute was taken almost verbatim, offer excellent illustrations of this point, to wit: *The Queen v. Brown*, 10 Queens Bench 381 (1883) : "B drew a loaded pistol from his pocket for the purpose of murdering S, but before he had time

classic cases under the statute, involving a gun, are where the would-be slayer draws the trigger with the requisite intent only to have the weapon misfire, or where he actually shoots but entirely misses his target.

Pennsylvania courts, in applying 18 P.S. §4711, have followed its words with exactitude devoid of even the slightest expansion. Thus the giving of poison to an agent, under the belief that said agent would deposit it in the spring of the intended victim, did not amount to an attempt to administer poison under the statute. See *Stabler v. Commonwealth,* 95 Pa. 318 (1880). Similarly, in *Commonwealth v. Young,* 446 Pa. 122, 285 A. 2d 499 (1971), we recently held that holding a gun to the victim's head and pulling the trigger is not sufficient to convict under 18 P.S. §4711, if the gun merely "clicked" and there was no proof that it was in fact loaded. Since there was no evidence in the case at bar that Clopton pulled the trigger, the Commonwealth properly did not seek an indictment under this section.

The Commonwealth did, however, proceed to indict and prosecute Clopton under a theory of common law attempted murder. The Act of June 24, 1939, P. L. 872, §1101, 18 P.S. §5101 relevantly provides that: "Every offense now punishable either by the statute or common

___

to do anything further in pursuance of his purpose the pistol was snatched out of his hand, and he was at once arrested." *Held*: Conviction quashed. *Regina v. Lewis,* 9 C. & P. 523 (1840): Defendant, in an attempt to discharge a blunderbuss at prosecutor, loaded it with gunpowder and leaden shots. When the intended victim refused to give defendant certain tax deeds, defendant addressed him by saying, "Then you are a dead man". Defendant was seized as he attempted to raise the gun to his shoulder. *Held*: Evidence not sufficient to sustain the charge. *The Queen v. Duckworth,* 2 Queens Bench 83 (1892): There the conviction was *sustained* under the statute, but the evidence showed that not only did the defendant point the loaded gun at the victim but placed his finger on the trigger and was "attempting to draw the said trigger", whereupon he was seized.

law of this Commonwealth and not specifically provided for by this act, shall continue to be an offense punishable as heretofore." At common law, any attempt to commit an indictable crime (not an attempt in itself) was a misdemeanor. See 2 Bishop, Criminal Law, §743 (1923); 1 Bishop, Criminal Law, §772 (1923); Perkins, *Criminal Attempt and Related Problems*, 2 U.C.L.A., L. Rev. 319 (1955).

The Court in *Commonwealth v. Ellis*, 349 Pa. 402, 404, 37 A. 2d 504, 505-06 (1944), offered a classic definition of such an attempt, to wit: " 'An attempt . . . is an overt act done in pursuance of an intent to do a specific thing, tending to the end but falling short of complete accomplishment of it. In law, the definition must have this further qualification, that the overt act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution. So long as the acts are confined to preparation only, and can be abandoned before any transgression of the law or of others' rights, they are within the sphere of intent and do not amount to attempts': Commonwealth v. Eagan, 190 Pa. 10, 21-2." We find that the facts of the instant case satisfactorily fulfill this definition. Clopton's act of forcing Riner, at gunpoint, out of his apartment and into a waiting vehicle, with the expressed intent to murder him as soon as he could be speeded to the appropriate destination, and the accomplishment thwarted only by a near-miraculous burst of energy from the intended victim, would most certainly constitute an overt act, in transgression *of both* the law and of another's rights, in pursuance of an intent to do "the specific thing" of murder, sufficiently proximate to the crime but falling short of its completion. Clopton's repeated statements concerning his intent to kill Riner made all his acts unequivocally related to the crime of murder.

Having concluded that such acts would constitute common law attempted murder, the issue this Court must now face, and on which this case turns, is whether the promulgation of statutes defining and punishing specific forms of the crime of attempted murder have pre-empted the field, thereby ousting the court of common law jurisdiction in this area, at least insofar as attempts via poison, knives and guns are concerned. In determining this question, we are mindful of the mandate of the Act of June 24, 1939, P. L. 872, §1104, 18 P.S. §5104, that: "In all cases where a remedy is provided or duty enjoined, or anything directed to be done by the penal provisions of any act of assembly, the direction of said act shall be strictly pursued; and no penalty shall be inflicted, or anything done agreeably to the provisions of the common law in such cases, further than shall be necessary for carrying such act into effect."

We approach the problem in two ways. Firstly, guided by the presumption of the Act of May 28, 1937, P. L. 1019, Art. IV, §52, 46 P.S. §552: "That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable", we make the inquiry into whether it would indeed be "unreasonable" to hold that the statutes do not work a derogation of the common law crime of attempted murder.[3] Secondly, since our attempted murder statutes are taken directly from the English enactments,[4] we find that the experience

---

[3] Since the provisions for attempted murder were enacted in June of 1939, we follow the mandate of the Act of May 28, 1937, P. L. 1019, Art. IV, §58, 46 P.S. §558, that, "The rule that laws in derogation of the common law are to be strictly construed, shall have no application to the laws of this Commonwealth hereafter enacted [May of 1937]."

[4] See *Stabler v. Commonwealth*, supra, at 321, 322, where the court held that the 82d section of the Act of March 31, 1860 (the

8

of the English courts in the application of such acts, although not binding, proves to be most instructive.

Turning to our consideration of legislative intent,[5] we must determine why the legislature would define, with such specificity, the most aggravated form of the crime, this extreme being the most obvious to discern and easiest to establish. Certainly, if our lawmakers intended that lesser acts be punishable as *attempted murder*, it would have made much greater sense to define the acts that would most minimally constitute the crime. At the very least, if the legislature wished that acts more remote to the completed crime were to be considered as attempted murder, it would not have defined it at all. Instead, the legislature would have simply promulgated a general enactment that all attempted murders were to be punishable by a seven-year maximum term of imprisonment, leaving to the courts the difficult task of defining and line drawing under the precepts of the common law.

For the legislature to have rationally specified the most aggravated form of attempt without intending to pre-empt the field would require that there be some meaningful difference between the statutory crime and the lesser attempts remaining at common law. We find none. It is true that at common law all attempts, even the attempts to kill, were only misdemeanors. See Blackstone, Commentaries on the Laws of England, (4th ed. 1792). The statutory offense makes the crime as defined a felony. But this difference is really one of semantics unless the sentence reflects the classification. We find that it does not.

---

verbatim predecessor of our 18 P.S. §4711) "is substantially a copy of the third section of the Act of 1 Victoria, chapter 85." See also, the Report of the Commissioners on the Act of 1860.

[5] For the factors relevant in construing legislative intent, see the Act of May 28, 1937, P. L. 1019, Art. IV, §51, 46 P.S. §551.

At common law, before 1790, attempted murder, as all other attempts for the "higher" crimes (murder, rape, robbery, arson and burglary) were punishable by corporal means at the pillory. See *Hackett v. Commonwealth*, 15 Pa. 95 (1850). In 1790, such inhumane punishments (nailing the offender's ears to the pillory is one example) were repealed, and the crimes in the "pillory" category were accorded two-year maximum prison sentences. In 1807, the two-year maximum sentence was repealed in favor of a seven-year maximum sentence. Although the Act of March 31, 1860 (which unlike the Act of 1807, contained the provisions for attempted murder such as the ones found in our current Act of 1939) repealed the section providing for a seven-year maximum for the pillory offenses, we find that seven years continued to be the standard, at least so far as the crime of common law attempted murder. This would obliterate any real difference between the statutory and common law form of the crime. We reach this result by employing either one of two acceptable approaches for determining sentences for common law crimes.

Section 178 of the Act of 1860 provided that: "Every felony, misdemeanor or offense whatever, not specially provided for by this act, may and shall be punished as heretofore." There is substantial authority[6] for the proposition that this section gave the courts jurisdiction to determine what the appropriate sentence should be,

[6] See *Commonwealth v. DeGrange*, 97 Pa. Superior Ct. 181 (1929) ; *Commonwealth v. Flaherty*, 25 Pa. Superior Ct. 490 (1904) ; *Commonwealth ex rel. Swisher v. Ashe*, 145 Pa. Superior Ct. 454, 21 A. 2d 479 (1941) ; Kessler, Common Law Offenses and Penalties in Pennsylvania, 33 Temple L. Q. 419, 421 (1960) ; Laub, Pennsylvania Manual, p. 26A (1966). Cf. Sadler, Criminal Procedure in Pennsylvania, §668 pp. 789-790 (1937).

guided by the rule, however, that "[w]here there is no punishment fixed by statute, the court may pass judgment *of a character similar to that provided for the class of offenses to which the particular crime belongs*: Commonwealth v. Kelsea, 103 Pa. Superior Ct. 399, 401, 157 A. 42." [Emphasis added.] See *Commonwealth v. Bausewine,* 156 Pa. Superior Ct. 535, 546, 547 (1945). Thus in *Commonwealth v. Orris,* 136 Pa. Superior Ct. 137, 7 A. 2d 88 (1939), the standard for maximum sentence to be imposed on attempted statutory rape, a common law attempt crime, was that set by the legislature for the offense of assault with intent to ravish (attempted forcible rape). Similarly, the maximum sentence for statutory attempted murder would provide the uppermost penalty for the crime at common law.

An alternative route, leading to the same result, reasons that Section 178 of the 1860 Act making pillory crimes punishable as "heretofore" simply referred to the law existing up until the date the 1860 Act was to take effect. Indeed, the "saving section" (Section 80 of the Act of 1860, at p. 458) provided that: "The acts of assembly, and parts thereof, hereinbefore repealed, shall be and the same are hereby continued in force and effect, until this act, . . . shall go into force and effect. . . ." Thus, since the 1807 Act preceded the 1860 penal code, and quite literally constituted the "heretofore", the seven-year standard for the pillory offenses would remain intact.

Turning to the experience of the English courts, we find that once the crime of attempted murder was made a statutory offense, all indictments for the crime (as shown in every leading case which we have examined) were uniformly brought under the statute. In the case of attempted murder by gun, where the intended victim suffered no bodily injury, the British courts consistently acquitted a defendant found not to have actu-

ally pulled the trigger. (See n. 2, supra). Never was an action brought or considered under the common law.

In 1861, England replaced its two section act for attempted murder with a five section enactment.[7] Sections 11 and 14 were simply a re-enactment of 1 Victoria C 85, §§3 and 4 (the near verbatim predecessors of our 18 P.S. §4710 and §4711). Sections 12 and 13 provided for attempted murder by explosives and fire. Section 15 was a catch-all provision punishing with a term of life imprisonment (the maximum sentence employed throughout the act) attempted murder "by any means other than those specified in any of the preceding sections of this Act". This last section has been interpreted by English courts to deal only with "any other means not *ejusdem generis* with the means specified in those earlier sections." *Queen v. Brown,* supra, at 384. Thus it did not expand the area of attempts by guns, poison, explosives, etc., but rather served as the basis for indictment when other devices and machines were employed as the criminal instrumentality.[8] The Court in *Rex v. White,* 2 Kings Bench 124, 132 (1910), held that the five-part act "was intended as a code for all attempts to murder. . . . After the passing of that act all attempts at murder necessarily fell within one of these five sections." See also, J. W. Cecil Turner, "Russell on Crimes" (12th ed. pp. 616-619). Any common law attempt not satisfying one of the five sections could no longer be punished as attempted murder. Thus it is clear that the English counterpart to our 18 P.S.

_____

[7] 24 and 25 Victoria C 100, §§11-15, Offenses Against the Person Act, 1861, as amended by the Criminal Justice Act, 1948, s. 1.

[8] Thus, for example, if one attempted to kill another by cutting the ropes of the scaffolding on which the intended victim stood at a height of ten stories, an indictment under Section 15 would be appropriate.

§4711 pre-empted the field as to guns, as well as to all the other means so specified.

We hold likewise, that there being no apparent reason, other than pre-emption, for the legislature to enact with such specificity the crime of attempted murder by gun, knife or poison, the common law indictment for that offense by those means can no longer be brought with success. This does *not* mean to say that attempts by *other means* (such as attempting to run over the intended victim with an automobile, for example) are not still punishable as common law attempted murder. It means only that acts constituting attempted murder at common law by the means specified in 18 P.S. §4711, but which are more remote from the completed crime than the conduct, described therein, are no longer so punishable.

It should be noted that those perpetrating such attempts, as in the case of the instant appellant, will by no means be absolved from criminal responsibility. Such deeds are still punishable under the provisions dealing with the various assaults and weapons charges. Certainly, the homicidal intent of the actor should prove most relevant upon the sentencing for those offenses.

The order of the Superior Court affirming the judgment of sentence imposed by the court of original jurisdiction on the appellant, Clopton, for attempted murder is reversed.

Former Mr. Chief Justice BELL and former Mr. Justice BARBIERI took no part in the consideration or decision of this case.

———

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

Defendant James Clopton and two other men physically wrenched one Billy Lee Riner from his home in the early hours of the morning, announced they were

going to kill him, placed him in a car while holding a shotgun and pistol to his head, and drove off, presumably to complete their mission.[1] Only miraculously did Riner manage to subdue his attackers and escape his intended doom. The majority concedes, as it must, that the above acts constituted a classic case of common law attempted murder;[2] but nevertheless concludes that this defendant and indeed no defendant can be guilty of attempted murder unless the trigger of his gun has actually been pulled. With such a holding I am in firm disagreement.

In reaching its result the majority proceeds on the theory that the Legislature intended to pre-empt common law attempted murder when it passed two statutes in 1939.[3] The statutes in question codify two well recog-

---

[1] The trial court found as a fact that the defendant had come from Oklahoma to kill Billy Lee Riner and collect $1,000.

[2] This Commonwealth has consistently followed the following test for determining whether an attempt has occurred: "An attempt, in general, is an overt act done in pursuance of an intent to do a specific thing, tending to the end but falling short of complete accomplishment of it. In law, the definition must have this further qualification, that the overt act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution. So long as the acts are confined to preparation only, and can be abandoned before any transgression of the law or of others' rights, they are within the sphere of intent and do not amount to attempts." *Commonwealth v. Hagan*, 190 Pa. 10, 21-22, 42 Atl. 374, 377 (1899). See also *Commonwealth v. Ellis*, 349 Pa. 402, 404, 37 A. 2d 504, 505-06 (1944) ; *Commonwealth v. Johnson*, 312 Pa. 140, 148, 167 Atl. 344, 346-47 (1933) ; *Commonwealth v. Crow*, 303 Pa. 91, 98, 154 Atl. 283, 285-86 (1931).

[3] The Act of June 24, 1939, P. L. 872, §710, 18 P.S. §4710 defines "assaults with intent to kill" as: "Whoever administers, or causes to be administered by another, any poison or other destructive thing or stabs, cuts or wounds any person, or by any means causes any person bodily injury, dangerous to life, with intention to commit murder, is guilty of felony. . . ."

nized types of conduct which fall within the common law definition of attempted murder—where, for example, the assailant actually pulls the trigger of his loaded gun and either (a) misses the intended victim (Section 4711) or (b) inflicts bodily harm but does not kill the intended victim (Section 4710). The majority concludes that by enacting these two statutes and remaining silent as to the other types of common law attempted murder, the Legislature meant to "pre-empt", and thus *narrow* the scope of common law attempted murder.[4] Thus under the majority's holding conduct which formerly would have been prohibited under the common law definition of attempted murder is no longer proscribed.

The majority in my view falls into error when it concludes that the Legislature remained silent as to the

---

The Act of June 24, 1939, P. L. 872, §711, 18 P.S. §4711, defines "attempts with intent to kill" as: "Whoever attempts to administer any poison or other destructive thing, or attempts to cut or stab or wound, or shoots at any person, or, by drawing a trigger or in any other manner, attempts to discharge any kind of loaded arms at any person, or attempts to drown, suffocate or strangle any person, with intent to commit the crime of murder, although no bodily injury is effected, is guilty of felony. . . ."

[4] I am at a loss to understand the majority's extended discussion of the British experience with common law attempted murder. Nowhere in the Act of May 28, 1937, P. L. 1019, Art. IV, §51, 46 P.S. §551, which establishes the guidelines for determining legislative intent, do I find justification for what the majority has done. The statute reads in pertinent part: "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature. . . . When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters—(1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such law."

areas of common law attempted murder not covered by Sections 4710 and 4711. Quite to the contrary the Legislature *at the same time* it enacted the above statutes *also* enacted Section 5101 which provides that: "[e]very offense now punishable either by the statute or common law of this Commonwealth and *not specifically provided for by this act, shall continue to be an offense punishable as heretofore.*"[5] Surely the Legislature, merely by highlighting two recognized categories of common law attempted murder, did not "specifically provide" or pre-empt the *entire* offense of common law attempted murder. Sections 4710 and 4711 read in pari materia with Section 5101, conclusively establish that the Legislature did not intend to exonerate from punishment any conduct prohibited by common law attempted murder.

Sections 4710, 4711 and 5101 indicate a logical and rational scheme by which the Legislature intended to highlight certain types of common law attempted murder. The two statutes codified areas of common law attempted murder that had been made certain through case by case interpretation and analysis. Other areas of common law attempted murder, however, do not lend themselves to such neat caterogization. Rather than attempt the herculean and perhaps impossible task of codifying the complete area of attempted murder, the Legislature, as it did in many other areas, quite sensibly left it to the further refinement of the courts.

The majority's interpretation leads it to an absurdity that it quite candidly acknowledges. Sections 4710 and 4711 deal specifically with attempted murder through such means as firearms and knives, and thus under the majority's analysis *all other means* not specifically mentioned are still governed by common law concepts of

---

[5] The Act of June 24, 1939, P. L. 872, §1101, 18 P.S. §5101. (Emphasis added.)

attempted murder.[6] Thus, if defendant James Clopton and his companions in this case had told the intended victim that they were going to kill him with, for example, a blackjack, the majority would in that instance sustain a conviction of common law attempted murder.[7] If the assailant instead of a blackjack chooses a firearm, the most lethal of all weapons, the majority holds that the offense of attempted murder is not committed until the trigger is actually pulled. I cannot believe that the Legislature intended such an anamolous result. Moreover, such an interpretation does violence to the statutory canon of construction which mandates that in construing a statute we must be mindful that "[t]he Legislature does not intend a result that is absurd."[8]

---

[6] It should be noted that the majority's conclusion that attempts with weapons *other* than guns, knives and poison are still controlled by common law principles of attempted murder is inconsistent with the majority's analysis of Sections 4710 and 4711. The majority reads Section 4711's reference to guns, knives, and poison as a legislative determination that attempts with these weapons would no longer be within the common law definition of attempted murder. To be consistent with its analysis the majority should *also* read Section 4710's reference to "by any means" as a specific statutory pre-emption of common law attempted murder when "any means" are used and the victim does not suffer bodily injury. Thus the majority would be required to hold that where a defendant attempted to kill a person by running him over with a car, but fortuitously the victim did not sustain bodily injury, the defendant committed no offense under Section 4710 (the victim did not incur bodily injury), nor under Section 4711 (that statute refers only to guns, knives, and poison), nor would he be guilty of common law attempted murder—because the majority would be required to conclude by its own reasoning that Section 4710 specifically pre-empted the offense of common law attempted murder.

[7] Even under the majority's analysis of Sections 4710 and 4711 its conclusion that defendant Clopton was not guilty of common law attempted murder is based on the unwarranted assumption that since defendant held a gun to the intended victim's head no other means might actually have been employed to complete the offense.

[8] Act of May 28, 1937, P. L. 1019, Art. IV, §52, 46 P.S. §552.

I dissent and would affirm the judgment of sentence. Mr. Chief Justice JONES joins in this dissent.