140 N.J. Super. 126 (1976)
355 A.2d 674
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BRUCE MERGOTT AND CARL ECKHART, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1975.
Decided January 28, 1976.
*128 Before Judges CARTON, CRAHAY and HANDLER.
Mr. Ralph J. Jabbour, Designated Counsel, argued the cause for appellants (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Michael A. Graham, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by HANDLER, J.A.D.
Defendants Bruce Mergott and Carl Eckhart were charged in an indictment for the rape of N.M., in violation of N.J.S.A. 2A:138-1, and with assaulting M.S. with intent to kill, in violation of N.J.S.A. 2A:90-2. After a long jury trial defendants were convicted of both charges. A codefendant was convicted of rape. Defendant Mergott brought a motion for a new trial which was denied. Thereafter, both defendants were sentenced to 10 to 15-year terms on the rape convictions and to consecutive 2 to 5-year terms on the assault with intent to kill convictions. Both appealed their convictions.
At the close of the State's case, defendant Eckhart's motion for a judgment of acquittal on the charge of assault with intent to kill was denied. Defendant Eckhart renewed his motion at the close of the trial and Mergott made a similar motion; both were denied. These rulings are claimed by defendants to have been in error.
*129 Resolution of this issue calls for a rather careful recapitulation of the evidence. This showed that at approximately 8 or 9 P.M. on August 18, 1971 M.S. and N.M. were at the New Jersey side of the George Washington Bridge hitchhiking to M.S.'s home in Wisconsin. They were picked up by a car containing defendants Mergott and Eckhart, Richard Probst (who had originally been a defendant) and Linda Huley. The people in the car offered M.S. and N.M. a place to stay for the night. They drove to a house belonging to Richard Probst's father. There M.S. and N.M. were given food and a room to sleep in. N.M. went to bed first, followed by M.S. about 30 minutes later.
From this juncture the State and defense versions of events diverge radically. Defendants claimed that N.M. told Mergott that she wanted to "ball" (i.e., have sex) with several of the men in the house, but that she didn't want M.S. to know what was going on. The State's theory was that N.M. was repeatedly raped.
M.S. testified that at 3:00 or 3:30 in the morning he was dragged from the bed he shared with N.M. by defendants Eckhart and Mergott. His hands were forced behind his back and Eckhart poked at him with a hunting knife. Someone said, "We want the girl." He was then blindfolded and led down to the basement by Probst and Eckhart. Because of the poor blindfolding job he was able to see N.M. yanked naked from the bed.
When the men first burst into the room N.M. screamed. Eckhart told M.S. to shut her up or he would kill him. As he was being led away M.S. was repeatedly told that he wouldn't get hurt unless he tried to be a hero, but that if he did try, he'd be a dead hero. Both defendants made threats.
M.S., who was naked, having gone to bed with no clothes on, was taken to the basement, tied up and placed on the floor. He was kicked and beaten by Probst when he refused to show appreciation for the record album Probst was *130 playing. M.S. was told that the people in the house were all members of a motorcycle gang called the Pagans and that the Pagans would get him if he didn't watch himself.
After a time defendant Mergott came downstairs and asked "Who's next to play with the girl? Who's next to plug N.?" There was also talk from Eckhart about cutting off one of M.S.'s fingers or an ear so that he would remember not to go to the police.
After a passage of time codefendant Catalano (not an appellant here) entered. N.M., wrapped in a blanket, was then brought downstairs. In M.S.'s presence Catalano had intercourse with N.M. and then demanded that she perform fellatio on him, threatening her with anal rape if she did not comply. N.M. acquiesced.
N.M. testified that after M.S. was taken downstairs she was raped by defendant Mergott and forced to perform an act of fellatio on him. She was mistreated in identical fashion by defendant Eckhart. She testified that she acquiesced in the sexual activity solely from fear and that she tried to talk both defendants out of raping her, promising not to go to the police if they left her alone. Both defendants had knives.
After Catalano finished with N.M., M.S.'s hands were untied and he was told to go gather his belongings. Upstairs, M.S. took a couple of letters from a dresser top, in order to have a record of the address.
N.M. and M.S. were warned that defendants had their addresses and that if they went to the police the Pagans  or their Hell's Angels affiliates  would find them and "get" them. Everyone then went to sleep in the basement.
Later that morning N.M. woke M.S. up, and John, one of the people in the house, told M.S. and N.M. to leave, giving them directions to the highway. In town they flagged down a police car and told their stories. Later that day they identified defendants.
*131 M.S.'s injuries consisted of 10 to 12 small scratches  none deep enough to draw blood  on his back where he had been poked with a knife or knives.
Other state witnesses testified that both defendants were armed with knives. Only one witness  other than defendants themselves  offered testimony in support of defendants' position. Peter Muti testified that he was at the house that early morning and saw N.M. walk out of the bathroom nude while defendant Mergott had his arms around her. Muti testified further that he heard Mergott ask N.M. if she was willing to go along with "this so-called fun thing" and that N.M. answered, "Yeah."
Probst, originally a defendant, testified that defendant Eckhart, at one point, removed an ax from one of the backpacks M.S. and N.M. had been carrying and began talking about "chopping them up."
Defendants testified that their initial desire to have sex with N.M. cooled because they thought she might have a disease; hence, they only let her perform oral sex and that only at her urging.
A trial judge must enter a judgment of acquittal, whether at the end of the State's case or at the conclusion of the entire case where, after viewing the relevant evidence in its entirety and giving the State the benefit of all reasonable inferences to be drawn therefrom, he finds that a reasonable jury could not find guilt beyond a reasonable doubt. State v. Reyes, 50 N.J. 454, 458-459 (1967). In reviewing a decision of the trial court on this question, this court is governed by that same standard. State v. Moffa, 42 N.J. 258, 263 (1964).
From our review of the record we are satisfied that the evidence adduced at trial was not sufficient to establish that defendants assaulted M.S. with the intent to kill him, within the purpose and meaning of N.J.S.A. 2A:90-2. The constituent elements of the statutory crime are an assault and an intent to kill. The intent to kill must be concomitant *132 and contemporaneous with the assault. See State v. Barker, 68 N.J.L. 19, 25-26 (Sup. Ct. 1902). The intent to kill must also relate directly to the assault and in that sense be the actuating cause of the assault. Otherwise stated, the natural object of the assault and indeed its very purpose must be the death of the victim.
The reported cases arising out of offenses found to have been committed in violation of N.J.S.A. 2A:90-2 suggest strongly that the assault must be deadly in purpose, that is, be actuated by and accompanied by a present intent to kill the victim. The intent must be one to kill immediately and by means of the assaultive behavior. For that reason the assault itself, though not eventuating in the death of the victim, is usually deadly in character. Many of the cases involve, for example, the firing of a gun. See, e.g., State v. Leibowitz, 22 N.J. 102 (1956); State v. Petrucelli, 98 N.J.L. 903 (E. & A. 1923); State v. Centalonza, 18 N.J. Super. 154 (App. Div. 1952); State v. Gallagher, 83 N.J.L. 321 (Sup. Ct. 1912).
An assault with intent to kill entails conduct which has surpassed the preparatory or attempt phase of criminality. As such, it must be characterized by assaultive behavior intended presently and contemporaneously to kill. Thus, in State v. Still, 112 N.J. Super. 368 (App. Div. 1970), certif. den. 57 N.J. 600 (1971), the court concluded that an assault with intent to commit sodomy involved greater proximity to completion of the offense than did an attempt to commit sodomy. 112 N.J. Super. at 371; Cf. State v. Blechman, 135 N.J.L. 99, 102 (Sup. Ct. 1941). Hence, while assault with intent to commit a particular crime encompasses an attempt to do so, attempt as such does not necessarily include an actual assault with criminal intent.
In Commonwealth v. Clopton, 447 Pa. 1, 289 A.2d 455 (Sup. Ct. 1972), this distinction was drawn. Defendant there was acquitted of the charge of assault with intent to kill, the court noting that the assault statute
*133 * * * was clearly inapposite herein since the superficial injuries (ones certainly not dangerous to life) sustained by Rimer [from the blows with the shotgun] were not inflicted with the intent to commit murder, but merely to force him to the place where such a homicidal wound could be inflicted. [447 Pa. at 4, 289 A.2d at 456]
It seems reasonably clear from the evidence that defendants did not intend contemporaneously to kill M.S. when they "assaulted" him. While there was ample evidence that M.S. was assaulted, the proofs did not establish that at the time M.S. was assaulted, defendants then intended to kill him.
The State argues that should the convictions for assault with intent to kill be reversed, this court ought to find defendants guilty of the lesser included offense of assault with a dangerous weapon. That course of action, however, would not be appropriate in this case. Defendant was not charged with the offense now suggested by the State and that crime is not necessarily included in the offense for which he was charged. More importantly, the jury, not having had the opportunity to do so, did not determine him to be guilty of the other offense. Cf. State v. McCoy, 114 N.J. Super. 479 (App. Div. 1971).
Accordingly, the convictions of the defendants of the crimes of assault with intent to kill are reversed. It is unnecessary, in light of this determination, to address the additional argument for reversal on the ground that the trial judge erroneously denied defendant Mergott's new trial motion on the charge of assault with intent to kill and that the verdicts thereon were contrary to the weight of the evidence.
It is further contended that the trial court denied erroneously defendants' motions for a new trial on the charge of rape. Defendants emphasize, in support of this argument, the lack of medical evidence and the incredibility of the testimony of the victim.
The absence of medical evidence as bearing upon the rape was not crucial. It did not in any degree diminish *134 the abundant evidence of the commission of rape upon which the jury concluded beyond reasonable doubt that defendants were guilty of this charge. The testimony of the victim, moreover, was not inherently unbelievable. Its evaluation was clearly for the jury.
Other points are raised by defendants pro se. It is asserted that Probst should not have been allowed to testify because he was unreliable. It is also claimed that there was an improper identification of defendants at police headquarters. These arguments we find devoid of merit.
Finally, it is argued that the sentences imposed were manifestly excessive. In view of our reversal of the convictions of assault with intent to kill we need be concerned only with the sentence of a 10 to 15-year term imposed on each defendant for his rape conviction. We note the further argument that in view of defendants' relative youth, the balance of their sentences should be modified to be served at the Youth Reception and Correction Center at Yardville in view of its superior rehabilitative facilities.
We have considered the entire record in this matter, including the presentence report and the additional reasons advanced pro se by letter bearing upon defendants' sentence and incarceration. We are satisfied that the sentences imposed are not manifestly excessive or a mistaken exercise of discretion. We do not perceive any sufficient basis for a modification of the sentences.
The convictions for rape are affirmed. The convictions for assault with intent to kill are reversed.