J-E02002-18

2018 PA Super 313

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| STEPHEN PREDMORE | |
| Appellee | No. 238 EDA 2017 |

Appeal from the PCRA Order entered December 12, 2016
In the Court of Common Pleas of Monroe County
Criminal Division at No: CP-45-CR-0000062-2016

BEFORE: GANTMAN, P.J., BENDER, P.J.E., PANELLA, J., SHOGAN, J.,
LAZARUS, J., STABILE, J., DUBOW, J., NICHOLS, J., and
MCLAUGHLIN, J.

DISSENTING OPINION BY STABILE, J.:          **FILED NOVEMBER 27, 2018**

I respectfully dissent from the Majority's decision to affirm the trial

court's order granting the pretrial petition for writ of *habeas corpus* of

Appellee/defendant, Stephen Predmore, on the charge of attempt to commit

criminal homicide. [1] The trial court found the Commonwealth failed to present

sufficient *prima facie* evidence that Appellee had a specific intent to kill the

victim, Alexander Marsicano. The Majority agrees, but does so by failing to

view the Commonwealth's *prima facie* evidence in the best light to which it is

---

[1] "Criminal Homicide" is classified as murder, voluntary manslaughter, or
involuntary manslaughter. 18 Pa.C.S.A. § 2501(b). Murder in turn is
classified as murder either in the first, second, or third degree. 18 Pa.C.S.A.
§ 2502(a)–(c). The crime charged in this case is attempt to commit first
degree murder. The Majority correctly observes that the crime of attempted
second or third degree murder does not exist. **See Commonwealth v.
Geathers**, 847 A.2d 730, 734 (Pa. Super. 2004).

entitled and by impermissibly weighing the *prima facie* evidence as if it were a jury deciding this case.

The Majority appropriately recognizes that our standard of review of a decision to grant a pretrial petition for a writ of *habeas corpus* is to examine the evidence and reasonable inferences derived therefrom in a light most favorable to the Commonwealth, and that as a question of law, this Court's review is plenary. Majority Opinion at p.3-4, citing **Commonwealth v. Dantzler**, 135 A.3d 1109, 1111-12 (Pa. Super. 2016). In the pretrial setting, the focus of a *habeas corpus* hearing is to determine whether sufficient evidence exists to hold a defendant in government custody until he may be brought to trial. **Commonwealth v. Fowlin**, 676 A.2d 665 (Pa. Super. 1996), citing **Commonwealth v. Owen**, 580 A.2d 412, 413 (Pa. Super. 1990). The *habeas corpus* petition is similar in purpose to a preliminary hearing. **Id.** In making a pretrial determination, a court is not limited to reviewing the evidence presented at a preliminary hearing. **Id.** The Commonwealth also may present additional evidence at the *habeas corpus* stage in an attempt to establish a *prima facie* case that a crime has been committed and that the accused is the person who committed the crime. **Id.** A pretrial petition for a writ of *habeas corpus* is the procedure for testing whether the Commonwealth has furnished *prima facie* evidence against the defendant at his preliminary hearing. **Commonwealth v. Carroll**, 936 A.2d 1148, 1152 (Pa. Super. 2007), **appeal denied**, 947 A.2d 735 (Pa. 2008).

The *prima facie* hurdle is less demanding than the Commonwealth's burden at trial of proving guilt beyond a reasonable doubt. **Commonwealth v. McBride**, 595 A.2d 589, 591 (Pa. 1991). A *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes sufficient probable cause to warrant the belief that the accused committed the offense. **Id.** The evidence need only be such that, if presented at trial and accepted as true, a judge would be warranted in permitting the case to go to a jury. **Commonwealth v. Hilliard**, 172 A.3d 5, 10 (Pa. Super. 2017). Further, as stated, "the evidence must be considered in the light most favorable to the Commonwealth so that inferences that would support a guilty verdict are given effect." **Id.** "The weight and credibility of the evidence is not a factor at this stage." **Id.**

Here, at the *habeas* hearing, the Commonwealth presented testimony from the investigating State Police trooper in addition to admitting into evidence the transcript from the preliminary hearing. Therefore, to comply with our appropriate standard of review, I initially shall set forth the *prima facie* evidence, before considering the legal question raised, viewing it in a light most favorable to the Commonwealth.

Marsicano, the victim, was the first witness called by the Commonwealth at the preliminary hearing held on January 8, 2016. He testified that Cheyenne Eberhart was his ex-girlfriend as of December 12, 2015, the date of the incident in question. N.T. Preliminary Hearing, 1/8/16, at 5. He was on his way home and driving past her residence. *Id.* at 5-6. He stopped in

the parking lot by Eberhart's apartment next to a truck owned by Appellee with whom he used to be friends. *Id.* at 6–7. He got out of his vehicle and at some point Appellee appeared. Appellee walked to his truck and got into an argument with Marsicano that then escalated into a fight. *Id.* at 7. Before fighting, Marsicano said to Appellee that it was "messed up how he was talking to [Eberhart] behind my back." *Id.* at 8. At that point, the argument ensued and Appellee shoved Marsicano, who then shoved him back before the two broke out into a fight. *Id.* They were both shoving and punching each other in the face and chest. *Id.* at 9. Eberhart came out of her apartment and tried to break up the fight by getting between the two of them and pushing them away. *Id.* at 9-10. At that point, Marsicano backed up. Appellee went to his truck. *Id.* at 10. Marsicano was about a foot away from the truck, but about 3 or 4 feet away from Appellee. *Id.* at 11. Appellee opened the door to his vehicle, opened the glove box, put a clip into a pistol, cocked it, and then pointed it at Marsicano. *Id.* at 11. Marsicano testified he was approximately 2½ to 3 feet away at the time Appellee pointed the gun at him and let off 3 shots. *Id.* at 12-13. When the first shot was fired Marsicano had his back to Appellee and was in the process of running away when Appellee let off two more shots. *Id.* at 12-13. He attempted to turn and run away when he first saw the firearm. *Id.* at 13. He was hit in the back of both calves. *Id.* at 13.

Upon cross-examination, Marsicano reiterated that he dated Eberhart for about six months and that their relationship ended a couple months before the incident in question. *Id.* at 17. Eberhart lived right off the Route 115 on

Valley Road. ***Id.*** He could see her house from Route 115. ***Id.*** He left Route 115 in order to go by Eberhart's home. ***Id.*** He did so at approximately 12:45 a.m. ***Id.*** He went to Eberhart's home because he saw Appellee's truck in the parking lot of her apartment complex. ***Id.*** He found this problematic because Appellee was always trying to talk to Eberhart behind his back when they were together. ***Id.*** at 18–19. He got out of his vehicle in the parking lot to verify if what he saw was Appellee's vehicle. ***Id.*** at 20. He was going to go back to his car and proceed home when Appellee came outside. ***Id.*** It was at that point Appellee approached him and started having a conversation with him. ***Id.*** at 20-21. They then wound up fighting and Eberhart came out of the apartment to break up the fight. ***Id.*** at 21. She pushed them apart. ***Id.*** He did not know at the time why Appellee went to his truck, but he heard a gun being loaded and cocked and watched it being pointed at him. ***Id.*** at 22. Appellee turned towards Marsicano and Marsicano then went to run before Appellee let off three shots. ***Id.*** He claimed that Appellee did not say anything to him; he just shot. ***Id.*** at 22, 24. He had his back to Appellee when he was shot while running. ***Id.*** at 22-23. When Marsicano saw the gun being pointed at him it was pointing at his chest to face level. ***Id.*** at 24. It was at that point he turned and started running and was shot while his back was to Appellee. ***Id.*** at 24. Marsicano admitted that he did have past altercations with Appellee and engaged in arguments and fights that involved Eberhart when Marcicano was dating her. ***Id.*** at 27. Specifically, he and Appellee argued over Appellee

trying to talk to Eberhart when Marsicano was dating her. *Id.* at 27. This occurred approximately two months before they broke up. *Id.*

Eberhart testified next on behalf of the Commonwealth. She testified that on December 12, 2015, she was at her apartment with Appellee watching a movie. *Id.* at 29. Appellee left her residence to go outside after she received a phone call from a blocked ID put in place after previous harassment from Marsicano. *Id.* at 29-30. She watched Appellee walk to the end of a sidewalk, make a right to the parking lot, and immediately heard fighting. *Id.* at 30. At that point, she could not see what was taking place, but ran to the side of the building and witnessed Marsicano and Appellee fighting. *Id.* at 30–31. She attempted to break up the fight by stepping between them when they were arguing as she was yelling at them. *Id.* at 31. She did not see Appellee go to his truck or anything in his hands. *Id.* at 32. After she broke the men apart the first time, they again began to argue, leading to a second fight. *Id.* at 32. She testified that the fighting did not break then because a gun was visible to her at which time she saw Marsicano grab Appellee's arms telling him to shoot him while the gun was flailing in the air. *Id.* The last thing she saw was Marsicano grabbing Appellee's arms and Appellee stating to Marsicano "the gun is loaded, you idiot." *Id.* at 32 – 33. She then heard the gun go off and observed Marsicano facing Appellee from approximately 5 feet away. *Id.* at 33. The men were not touching each other. *Id.* She testified the first shot she saw was aimed at the pavement. *Id.* While she heard a second shot, she never saw it. *Id.* Appellee then got into his vehicle to leave

while Marsicano was still standing before Marsicano then laid down on the ground and started vomiting. *Id.* at 33–34.

Upon cross-examination, Eberhart again testified that she and Appellee were watching a movie at her residence and that she previously had a relationship with Marsicano for about four months that ended about mid-October before the December incident. *Id.* at 35 – 36. Marsicano had been in constant contact, harassing her from mid-October to December 12, 2015. *Id.* at 36. Consequently, she blocked him on all social media and had his phone number blocked. *Id.* Nonetheless, Marsicano continued to use text apps on his phone to contact her daily and to harass her every day that eventually caused her to secure a Protection from Abuse ("PFA") order against him. *Id.* at 36–37. When the initial fight broke up, both Marsicano and Appellee took a step back from each other and continued arguing verbally. *Id.* at 38. Less than a minute lapsed before the second round of fighting began. *Id.* She disagreed with Marsicano's testimony that there was only one round of fighting before he stepped back after she broke it up. *Id.* She also disagreed with Marsicano's testimony that after he first saw the gun he turned and began to run away. *Id.* She never saw Marsicano turn to run away, testifying that when the second round of fighting began Marsicano grabbed Appellee's arms telling him to shoot him. *Id.* at 39. She did not observe Appellee threaten Marsicano after he retrieved his gun. *Id.* Rather, Marsicano grabbed Appellee's arms while the gun was flailing in the air when Appellee stated to Marsicano, "the gun's loaded, you fucking idiot." *Id.* at 40.

She was fearful of Marsicano because he was grabbing Appellee's arms. *Id.* Eberhart testified that Marsicano was telling Appellee to shoot him, saying "I dare you, motherfucker." *Id.* She stated that Marsicano appeared to be intoxicated when he appeared at her home and engaged in the fight with Appellee. *Id.* at 41–42.

Upon redirect, Eberhart confirmed again that, when she heard the first shot, Marsicano was approximately five feet away from Appellee and there was no physical contact at that point. *Id.* at 44. Upon re-cross, she testified again that the first shot went into the ground. *Id.*

The final witness to testify at the preliminary hearing was Pennsylvania State Police Trooper Jeffrey Kowalski, who responded to the December 12, 2015 incident. *Id.* at 46. He testified that Appellee indicated he was acting in self-defense in order to stop the beating. *Id.* at 50. In his affidavit of probable cause, Trooper Kowalski stated that the argument turned physical, and that upon breaking away from one another, Appellee went to his truck, opened the passenger door, obtained a Ruger model SR 9C9-millimeter pistol, pointed the gun in the direction of Marsicano, and discharged three rounds. *Id.* at 51–52. At the conclusion of Trooper Kowalski's testimony, the magistrate bound the charges over for court.

Appellee again filed a petition for a writ of *habeas corpus* with the trial court. A hearing was held on June 20, 2016. At that time, the Commonwealth submitted the transcript from the preliminary hearing as an exhibit. N.T. Hearing, 6/20/16, at 3. The Commonwealth again called Trooper Kowalski to

testify. He again testified that he responded to a shooting at Eberhart's residence and that he had an opportunity to speak with Appellee. *Id.* at 6. Appellee advised the trooper what happened that evening and provided a verbal and written statement. *Id.* at 7. Appellee admitted that he retrieved a firearm from his truck that was located in the parking lot of Eberhart's apartment building. *Id.* He obtained it from the center console. *Id.* Appellee did not have a permit to conceal the weapon. *Id.* On cross-examination, the Trooper indicated he spoke to four individuals on the evening of the incident, but none were ever asked if there was a specific intent to kill Marsicano that evening. *Id.* at 11. Instead, individuals provided statements indicating that the gun was fired in the direction of Marsicano by Appellee. *Id.* The Trooper confirmed that Appellee indicated he was at Eberhart's residence on the evening of the incident to watch a movie. *Id.* at 12. His understanding was that Marsicano appeared at the incident site while driving up Route 115 when he was able to see the rear of Eberhart's residence and Appellee's truck parked there. *Id.* at 12. He knew that Marsicano and Eberhart were formerly boyfriend and girlfriend. *Id.* at 12-13. Marsicano confirmed to the Trooper that he stopped because he saw Appellee's truck at Eberhart's home. *Id.* at 13. Marsicano indicated that Appellee approached him in the parking lot of the apartment complex and that a fight ensued that began with a verbal altercation before it became physical. *Id.* The gun was retrieved after the fight became physical, a shoving match started, the men ended up on the ground, and that, after they were separated, Appellee went to his vehicle and

obtained the gun. *Id.* at 13–14. Marsicano and Appellee were separated when the shots were fired, *Id.* at 14, and witnesses who provided statements to Trooper Kowaski also indicated that after the gun was obtained, Marsicano and Appellee struggled again, but then became separated and that is when the shots were fired. *Id.*

Upon cross-examination, Trooper Kowalski indicated that Marsicano stated he was shot twice in his legs and that he feared for his life when the gun was pointed at him. *Id.* at 15. One bullet struck the victim in his lower right leg and one in the lower left leg. *Id.* at 16. Finally, he indicated that Marsicano showed up to Eberhart's house uninvited and that Appellee indicated he was simply defending himself to stop the beating perpetrated by Marsicano. *Id.* at 18.

A crime generally consists of two elements, a physical, wrongful deed, the *actus reus*, and a guilty mind that produces the act, the *mens rea*. ***Commonwealth v. Ricker***, 170 A.3d 494, 502, n. 7 (Pa. 2017) (Saylor, C.J., concurring). The Crimes Code provides that "[a] person commits an attempt when with intent to commit a specific crime [the *mens rea*], he does any act which constitutes a substantial step [the *actus* reus] towards the commission of the crime." 18 Pa.C.S.A. § 901(a). A conviction for attempted murder requires the Commonwealth to prove beyond a reasonable doubt that a defendant had a specific intent to kill and took a substantial step towards that goal. ***Commonwealth v. Blakeney***, 946 A.2d 645 (Pa. 2008). "[I]n the

attempt setting, the *mens rea* level of 'intentionally' attaches to the result."[2]

***Commonwealth v. Roebuck***, 32 A.3d 613, 622 (Pa. 2011); ***see Roebuck***, 32 A.3d at 622 n.20 ("[T]o be guilty of criminal attempt, a defendant's conscious objective must be to cause the result necessary to the substantive crime."). Thus, to prove that Appellant had the *mens rea* for attempted murder, the Commonwealth had to establish that Appellee had the "conscious objective," that is, the goal, of killing the victim. ***Cf. Commonwealth v. Hall***, 830 A.2d 537, 541 (Pa. 2003) (to prove defendant had *mens rea* for aggravated assault, Commonwealth was required to prove that he had "conscious object to inflict serious bodily injury" on victim). "The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence." ***Commonwealth v. Schoff***, 911 A.2d 147, 160 (Pa. Super. 2006) (citation omitted). It also may be established

---

[2] In ***Commonwealth v. Clopton***, 289 A.2d 455 (Pa. 1972), our Supreme Court offered a classic definition of attempt, to wit:

> An attempt … is an overt act done in pursuance of an intent to do a specific thing, tending to the end but falling short of complete accomplishment of it. In law, the definition must have this further qualification, that the overt act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution. So long as the acts are confined to preparation only, and can be abandoned before any transgression of the law or of others' rights, they are within the sphere of intent and do not amount to attempts.

***Clopton***, 289 A.2d at 457-58, citing ***Commonwealth v. Ellis***, 37 A.2d 504, 505-06 (Pa. 1944).

through a combination of direct and circumstantial evidence. **Commonwealth v. Alford**, 880 A.2d 666, 671 (Pa. Super. 2005) (citations omitted), **appeal denied**, 890 A.2d 655 (Pa. 2005). "Specific intent may be formed in an instant." **Commonwealth v. Mollett**, 5 A.3d 291, 313 (Pa. Super. 2010) (citation omitted), **appeal denied**, 14 A.3d 826 (Pa. 2011).

The Majority states that for purposes of this appeal, it is undisputed that Appellee took a substantial step toward the commission of a killing. **See** Majority Opinion at p. 7. I agree. The sole issue presented here challenges the trial court's determination that the Commonwealth failed to present sufficient *prima facie* evidence of Appellee's specific intent to kill. I conclude the Commonwealth presented more than enough *prima facie* evidence of specific intent to kill to allow the charge of attempted criminal homicide to proceed to a jury trial.

Viewed in a light most favorable to the Commonwealth, the evidence adduced during the preliminary hearing and before the trial court established the following. Prior to December 12, 2015, animosity existed between Marsicano and Appellee based upon Marsicano's belief that Appellee had been communicating with Eberhart while Marsicano and she were dating. On December 12, 2015, at or about 12:45 a.m., Marsicano was driving past Eberhart's residence when he noticed Appellee's truck parked outside her apartment. He turned off the highway and stopped his vehicle in the parking lot next to Appellee's truck outside Eberhart's apartment. Appellee was visiting Eberhart at the time. Despite Eberhart complaining about Marsicano

harassing her prior to this time and securing a PFA order against him, Marsicano proceeded to call Eberhart while she was in her apartment with Appellee. Given the acrimonious history between Marsicano and Appellee and Appellee's belief that Marsicano was outside Eberhart's apartment, Appellee went to the parking lot outside Eberhart's apartment and found Marsicano in the parking lot next to his truck. A fistfight eventually ensued between Appellee and Marsicano because Appellee believed the victim was trying to harass Eberhart who was then his girlfriend. The two men began quarreling and exchanging shoves and punches. Eberhart arrived and managed to step in between them and break up the fight.

Instead of ceasing hostilities, Appellee intentionally and purposefully went to his truck to procure a gun with the intent of firing it at Marsicano. Thereafter, Appellee walked over to his truck, opened the door, retrieved a gun from the glove compartment, loaded the gun, cocked it, turned toward Marsicano and pointed the gun at his face to chest to level. According to Marsicano, he was several feet away from Appellee when Appellee pointed his gun at his face and chest before firing three shots at him. At this point, Marsicano stated that he feared for his life. According to Eberhart, Marsicano grabbed Appellee's arms and while the gun was flailing in the air, Appellee warned Marsicano that the gun was loaded. Not taking heed, Marsicano taunted Appellee to go ahead and shoot him. Appellee fired three shots. The first hit the pavement. The second and third hit Marsicano in his left and right calves while he was attempting to run away from Appellee, thus evidencing

that the second and third shots were not meant to scare, but to harm the victim.

Unlike the trial court and Majority, I conclude that the Commonwealth submitted ample *prima facie* evidence of a specific intent by Appellee to kill Marsicano. The *mens rea* of Appellee's specific intent to kill had its origins in the acrimony between Marsicano and Appellee that existed prior to the date in question. This pre-existing acrimony evolved into a fistfight on the night in question. As the evidence indicates, after the fight, Appellee went to his truck to retrieve his gun, loaded and cocked it, and then pointed it at Marsicano's face and chest, sufficiently evidencing a specific intent to kill. Marsicano told trooper Kowalski that he feared for his life when Appellee pointed the gun at him. "A gun is a lethal weapon; pointing it towards a person, and then discharging it, speaks volumes as to one's intention." **Commonwealth v. Hall**, 830 A.2d 537, 543 (Pa. 2003). Firing multiple shots speaks even more loudly as to Appellee's intent. ***Id.*** (firing two shots "evidenc[es] a more settled intent . . . than a single shot"). The Majority briefly mentions these acts in its summary of the facts, Majority Op. at 6, but fails to construe them in the light most favorable to the Commonwealth. Thus, the Commonwealth presented sufficient facts to establish *prima facie* evidence of a specific intent to kill by Appellee.

In its opinion disposing of Appellee's motion for *habeas corpus* relief, the trial court concluded that the Commonwealth did not establish a specific intent to kill for the crime of attempted murder. The trial court arrived at this

conclusion relying upon case law that "a specific intent to kill may be inferred from the use of a deadly force upon a vital part of the human body." Trial Court Opinion, 12/12/16 at p. 3-4, citing **Geathers**, 847 A.2d at 737 (citation omitted in original). From this, the trial court concluded that since the lower legs are not a vital part of the body and Marsicano was shot in his calves below the knee, it could not find any specific intent to kill had been established. **Id.** at 4. I disagree.

The statement that a specific intent to kill may be inferred from the use of a deadly force upon a vital part of the human body is merely a presumption of fact that permits a jury to find intent from the use of a deadly weapon upon a vital part of the body. **Commonwealth v. O'Searo**, 352 A.2d 30 (Pa. 1976). This presumption arises from the fact that it is common knowledge that such a use is likely to cause death and therefore, entitles a jury to infer that the intent of a person using such a weapon in such a manner was to kill. **Commonwealth v. Kluska**, 3 A.2d 398, 402 (Pa. 1939). As a presumption of fact, it permits a *prima facie* inference. **O'Searo**, **supra**. Nonetheless, as the Majority correctly recognizes, *the absence of the use of a deadly weapon against a vital part of a victim's body does not preclude a finding of intent to kill, it only precludes the use of the presumption*. Majority Opinion at 11, citing **Kluska**, 3 A.2d at 402. The trial court committed error by incorrectly concluding that, if a deadly weapon was not used against a vital part of a victim's body, no specific intent to kill for attempted murder may be inferred. The trial court failed to recognize that the intent to kill from use of a deadly

weapon upon a vital part of a victim's body is merely a factual presumption that does not preclude proving specific intent otherwise. Moreover, the trial court had an obligation to examine the entire *prima facie* evidence offered by the Commonwealth before determining whether a *prima facie* case had been established for attempted murder.

The Majority faults the Commonwealth for only addressing the *actus reus* of attempted murder and not the *mens rea*, or specific intent, which is the issue in this case. The Majority states that the Commonwealth only describes its proof of the *actus reus* of attempted murder, and then improperly and summarily concludes, absent invocation of a relevant presumption, that the *mens rea* naturally flows from proof of the former. Majority Opinion at 7. Respectfully, I disagree.

In its brief, the Commonwealth points to *prima facie* evidence wherein Appellee went to his vehicle, retrieved a pistol from the glove box, put a clip in the pistol, cocked it and then pointed it at Marsicano. Commonwealth's Brief at 16. The Commonwealth notes Appellee then fired three shots at the victim while he was attempting to run away, striking him in both legs. **Id.** From this, the Commonwealth argues that the factfinder could reasonably find that Appellee took a *substantial step toward the intentional killing* of Marsicano. **Id.** While it is true, as the Majority notes, that the juxtaposition of a "substantial step" and "intentional killing" in the text of the Commonwealth's brief suggests some confusion, it seems clear from the

Commonwealth's brief that it is arguing its *prima facie* evidence was sufficient to satisfy both the *mens rea* and *actus reus* of attempted murder.

In the absence of a presumption, it is necessary to discuss substantial step evidence as that may bear upon proof of a specific intent to kill. An act is a substantial step if it is a major step towards the commission of a crime and strongly corroborates a jury's belief that a person, at the time they did the act, had a firm intent to commit that crime. **See Geathers**, **supra**; Pennsylvania Suggested Standard Criminal Jury Instructions § 12.901a.1. Therefore, to connect the specific intent and a substantial step in the crime of attempted murder, by necessity, there must be a showing as to how the substantial step relates to specific intent. **See Geathers**, **supra** (specific intent to kill proven where defendant and victim had a verbal altercation, the situation calmed, defendant left the scene and returned with a gun, defendant shot at victim but missed, victim ran and defendant shot two more times, victim ran down the street and defendant shot again striking left side of victim's head). I, therefore, would not fault the Commonwealth for summarily discussing all of its *prima facie* evidence to establish the required specific intent to kill. As explained in greater detail, **supra**, the *prima facie* evidence offered by the Commonwealth in fact was much more than that briefly described above from its brief.

On the merits of establishing a *prima facie* case of specific intent, the Majority concludes that it is not reasonable to infer that the Commonwealth produced evidence of a specific intent to kill for three reasons. First, the

victim, Marsicano, instigated a confrontation with Appellee over his ex-girlfriend, Eberhart. Second, there was a complete lack of any verbal expression of intent to kill by Appellee despite the scuffle that occurred before the shooting. Third, the near impossibility of Appellee missing any area or vital portion of the victim's body from the range at which he fired, but for an intent to scare or harm, fell short of a specific intent to kill. Majority Opinion at 16.

In my opinion, the Majority errs in its analysis both by weighing the *prima facie* evidence and by repeatedly interpreting this evidence in a light more favorable to Appellee than, as required, to the Commonwealth.

As for its first reason for not finding specific intent to kill, the Majority labels this event "an unprovoked instigation [by the victim] of a confrontation with [Appellee]" to argue against specific intent. Majority Opinion, at 16. The Majority blames the victim for causing the fight—and by so doing, lays the foundation for suggesting that the victim brought the shooting on himself. It is simply wrong, however, for the Majority to take this position, given the principle that we must view the evidence in the light most favorable to the Commonwealth. While a jury might conclude that the victim instigated the fight, we are required at this stage of the proceeding to conclude that Appellee instigated the fight by storming outside Eberhart's residence to confront the victim. The evidence could solidly support this inference. The assertion that the victim instigated the confrontation falls flat when the evidence is construed in a light most favorable to the Commonwealth. Blaming the victim for

starting the fight is tantamount to interpreting and weighing the evidence in a light most favorable to Appellee.

As for its second reason for not finding specific intent to kill, referencing *Commonwealth v. Cross*, 331 A.2d 813 (Pa. Super. 1974), the Majority faults the Commonwealth for not proffering any evidence that Appellee verbally indicated, directly or indirectly, his intent to kill Marsicano. In *Cross*, a bullet penetrated the outer panel of a car door at a height near the stomach of the victim. The evidence demonstrated a long-standing feud between the defendant and the victim's brother. Immediately prior to shooting, the defendant yelled to the victim, "[t]his is for your brother." While the verbalization in *Cross* may well have supported a specific intent to kill, this Court in no way suggested that an express verbal threat was a prerequisite to establishing a specific intent to kill. The verbalization was merely part of the evidence offered to prove specific intent in that case. The Majority's criticism that the Commonwealth did not offer any other circumstantial evidence to prove a specific intent to kill is simply not in accord with the *prima facie* evidence offered by the Commonwealth when viewed in a light most favorable to the Commonwealth.

As for its last reason, the Majority posits that specific intent to kill is absent in this case, because "the near impossibility of Appellee missing any area or vital portion of the victim's body from the range at which he fired, but for an intent to scare or harm that fell short of a specific intent to kill." Once again, the Majority deprives the Commonwealth of its evidence viewed in the

best light. A jury must decide whether intent to kill is proven beyond a reasonable doubt. This Court does not have that prerogative when reviewing whether a *prima facie* case has been established. The evidence produced before the trial court suggests that the events here were violent, highly emotional and rapidly unfolding. The victim was attempting to flee at the time the shots were fired, arguably while Appellee did not have complete control over his gun having fired it immediately after the victim grabbed his arms before attempting to flee. A jury could conclude that under these fraught circumstances, the victim escaped death because of Appellee's poor aim at the time, and not because of a lack of intent to kill the victim, especially under circumstances where the victim was taunting Appellee to shoot him.

Nor do I believe the Majority considers the shooting evidence in a light most favorable to the Commonwealth by viewing the first shot into the ground as merely intending to scare the victim. Here, the evidence can be viewed far differently. Appellee fired a second and a third shot at close range.[3] Both struck the victim, thereby evidencing an intent not to scare, but to harm. If it was Appellee's initial intention just to scare, his subsequent shots certainly go far to dispelling that notion, as they were aimed at and hit the victim's

---

[3] The Majority quotes the victim's testimony indicating that Appellant shot at him from at most two and a half to three feet away. Eberhart testified, however, that the first shot was from five feet away. *Id.* at 33. The Majority should have resolved this conflict by finding that the first shot was five feet away, for this version of events was most helpful to the Commonwealth. The greater the distance between Appellee and the victim, the greater the likelihood that Appellee intended to kill him but simply aimed poorly.

body.  It is impermissible to infer under these facts that Appellee only wanted to cause fright.  A gun is designed to kill.  **See Hall**, **supra**.  Appellee aimed his gun at the victim's body. The question as to whether the discharge of Appellee's gun evidenced a specific intent to kill is a question for the jury, not one for the trial court or this Court upon review of the Commonwealth *prima facie* evidence.

For these reasons, I respectfully dissent.  I would reverse the order dismissing the charge of attempted murder and remand to the trial court for further proceedings.