Commonwealth *v.* Kluska, Appellant.

Argued December 9, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Thomas J. Minnick, Jr.,* and *Thomas D. McBride,* with them *M. J. O'Donoghue,* for appellant.

*Vincent A. Carroll,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY MR. JUSTICE STERN, January 9, 1939:

A jury found defendant guilty of murder of the first degree and fixed the penalty at death. The court overruled his motion for a new trial and imposed sentence in accordance with the verdict.

Defendant had quarreled with his wife, as a result of which she left him and went to reside with her mother. On a November afternoon in 1937 he met her—according to his subsequent statement, accidentally—and urged her to return to him, but she refused. They stood talking together under a railroad bridge. Afterwards she was heard shouting for help and screaming that her husband had thrown acid at her, and was found in great agony, her face dripping with the acid. Taken to a hospital, she died within two hours, her death being caused by the action of the corrosive fluid which had been drawn by inhalation through the nasal passages into her throat.

Defendant did not take the stand nor offer any testimony, but, according to a written statement made to the detectives and introduced in evidence by the Common-

wealth, he claimed that he had intended to drink the acid and commit suicide, that when he started to do so his wife tried to wrest from him the can containing it, that some of the contents spilled in his face and blinded him so that he could no longer see her nor know what became of her; he denied that he threw the acid. His defense was, therefore, that her death was accidental. The Commonwealth proved that the liquid was hydrofluoric acid, highly corrosive, and not acid of the kind that defendant regularly used in his work as a painter; also that the position of stains on the abutment of the bridge indicated that the acid had been hurled, not spilled. A police officer testified that he asked defendant at the station house "why he threw the acid on his wife, and he said that his wife set him up, and he said, I would do the same in his place."

The trial revolved principally around two issues of fact: (1) Did defendant throw the acid, or did his wife's death accidentally result from a struggle between them for possession of the can? (2) If the acid was deliberately thrown, was defendant's intent merely to cause bodily harm to his wife or to take her life?

Unconvincing as defendant's explanation of the occurrence must have appeared to the jury, he was nevertheless entitled to have it presented for their consideration according to applicable principles of law. The learned trial judge charged: "If, by a fair preponderance of the evidence, the defendant has established that the killing was an accidental one, when the deceased, Mary Kluska, was struggling with him in the endeavor to prevent him swallowing the acid, the defendant should be acquitted." Although this did not amount to an express statement that the burden was upon defendant to establish by a fair preponderance of the evidence that the death was accidental, it clearly implied that such was the law, and was therefore erroneous. The defense that the killing was accidental is not of the affirmative type which threw upon defendant the burden of

proving it, either by preponderance of evidence or otherwise; such a defense, instead of admitting the intentional act charged in the indictment, directly challenges and controverts it: *Commonwealth v. Deitrick*, 218 Pa. 36, 221 Pa. 7; *Commonwealth v. Lockett*, 291 Pa. 319, 324. No doubt the error was a mere inadvertence in the course of the charge, but it may have had a gravely prejudicial effect upon the jury, nor was it corrected by the court's further statement that "Where the defense is accidental killing, the burden is still on the Commonwealth to prove guilt beyond a reasonable doubt," since it would have been necessary so to charge even if the defense of accidental killing were one that had to be proved by a preponderance of the evidence.

The second and more important issue in the case was whether defendant had the intent to kill. Undoubtedly there was evidence sufficient to show the existence of such an intent. Ordinarily, perhaps, one would not expect death to result from throwing acid upon the face, but, on the other hand, such an effect might be apprehended. Considering the quantity and quality of the acid which defendant used, the motive which actuated him (resentment because of his wife's refusal to go back to live with him), and all the other circumstances of the case, it would be for a jury to say whether they believed beyond a reasonable doubt that his intent was to kill. However, the selection of such an instrumentality as here employed is so unusual if the intention is to cause death, that the trial judge should not only have made the question of defendant's intent the principal subject of discussion in the charge, but also have been meticulously careful to state accurately—if at all—the legal principle concerning the presumption which arises from the use of a deadly weapon upon a vital part of another's body. The court charged: "Our Supreme Court has said where one intentionally uses a deadly weapon upon a vital part of the body of another, there is a legal presumption of an intent to kill, which cannot be rebutted

by the assailant's own testimony that he did not so intend, but whether the assailant intended to use the weapon at a vital part is a question of fact, and he may then deny that he intended to so use it or that he intended to take life." It is true that this is a statement taken verbatim from the case of *Commonwealth v. Zec,* 262 Pa. 251, 257, but it is not in accord with the prevailing authorities. The distinction between a legal and a factual presumption was discussed at length in *Watkins v. Prudential Insurance Co.,* 315 Pa. 497, 500-503; a legal presumption is in effect a rule or conclusion of law, whereas a presumption of fact is but a prima facie inference which can be rebutted by testimony to the contrary. The presumption from the use of a deadly weapon on a vital part of the body arises from the fact that it is common knowledge that such a use is likely to cause death and therefore a jury may infer that the intent of the person using such a weapon in such a manner was to kill. This presumption may be overcome by the assailant himself denying such intent, or by any other appropriate evidence. In *Commonwealth v. Drum,* 58 Pa. 9, in which the Pennsylvania law of homicide found its most classic expression, it was stated (p. 17) that the presumption arises "in the absence of qualifying facts." In *Commonwealth v. Green,* 294 Pa. 573, the question was discussed at length, and it was definitely held that the presumption was one not of law but of fact, and arose "in the absence of qualifying circumstances." To the same effect see *Commonwealth v. Troup,* 302 Pa. 246, 252, 253; *Commonwealth v. Robinson,* 305 Pa. 302, 310. Moreover, the statement of law as phrased in the charge is confusing in its inconsistency; although saying that the presumption of the intent to kill in such a case cannot be rebutted by the assailant's own testimony that he did not so intend, it adds that he "may then deny . . . that he intended to take life."

It may be well to reiterate, in order to avoid misunderstanding, that there was sufficient evidence in the

present case to warrant a jury in finding first degree murder, apart from any presumption arising from the use of a deadly weapon. Life may be taken as the result of an intent to take it even though no deadly weapon, in the ordinary sense of that term, be used. In *Commonwealth v. Blakeley*, 274 Pa. 100, a club was the instrument by which death was inflicted, and the court said (p. 105) : "The implement in itself, as an indication of a purpose to effect the result attained, is not separable in any case from its use. A weapon ordinarily may be employed in such a manner that death is improbable. Its nature must be considered with the manner of its application and its effect, and, from the combined circumstances, there may appear an intention to kill. . . . it is always for the jury to say, from all the evidence adduced, whether an intention to kill was present in the mind of the defendant." In *Commonwealth v. Lisowski*, 274 Pa. 222, a wife was killed by being assaulted by her husband with his fists and feet, but a conviction of first-degree murder was sustained. In *Commonwealth v. Murray*, 2 Ashmead's Rep. 41, a man was beaten to death with a leather strap, and the court said (p. 58) : "If we should hold, that a killing by weapons, which, in the popular sense, are not regarded as deadly, is inadequate to induce a conviction of murder of the first degree, we establish a precedent jeopardizing the life of every man in the community, . . . No such rule happily exists; and although the nature of the weapon used may be quite material in the ascertaining of the intent to kill, that intent must still, in every case, be collected from all the attending circumstances, let the instrument of death be what it will." In *Commonwealth v. McMillan*, 144 Pa. 610, the killing was accomplished by the use of a heated poker; a conviction of murder in the first degree was affirmed. In *Commonwealth v. Guida*, 298 Pa. 370, where a victim was beaten to death without the use of any weapons, the court said (p. 374) : "The absence of deadly weapons deprived the Commonwealth of the pre-

sumption of an intent to kill which their use would have afforded; but it cannot be affirmed as a legal conclusion that an intent to take life is rebutted by the absence of a deadly weapon. Such a conclusion would be unthinkable in a case like killing by strangulation or drowning."

Considering that there is some doubt as to the likelihood of acid causing death when thrown upon the face, and therefore whether it should be regarded, when so used, as a "deadly weapon," it would probably have been better for the learned trial judge to have omitted altogether any reference to the presumption arising from the use of a deadly weapon upon a vital part of the body. It is true that he explained to the jury that the situation here was "somewhat different" from one where a pistol or a knife is used, that it was for them to determine whether "defendant knew that this acid was so deadly it was likely to be fatal," and that, unless defendant had such knowledge, "we do not have the presumption in this case that would arise if he had used a revolver or some other deadly weapon." Even this qualification, however, goes merely to the knowledge of defendant as to whether the acid was deadly. He evidently knew it was deadly if swallowed, for, according to his statement, he intended to use it in that manner in order to commit suicide, but the real question is whether he knew or believed that, if thrown upon the face, its results would be likely to be those of a "deadly weapon" used upon a vital part of the body.

One of defendant's assignments of error complains of the instruction to the jury that "All homicide is presumed to be malicious; that is, murder of some degree, until the contrary appears in the evidence." This, too, was evidently an inadvertence, because the presumption of malice, and therefore of murder as distinguished from manslaughter, does not arise in the case of *all* homicide but only of felonious homicide *(Commonwealth v. Greene,* 227 Pa. 86, 89; *Commonwealth v. Tompkins,* 267 Pa. 541, 543; *Commonwealth v. Robinson,* 305

Pa. 302, 306), or of illegal or unlawful homicide (*Commonwealth v. Bednorciki,* 264 Pa. 124, 128; *Commonwealth v. Carroll,* 326 Pa. 135, 137). In *Commonwealth v. Elliott,* 292 Pa. 16, where the trial judge charged, as here, that *all* homicide is presumed to be malicious, the court, while criticising this as incorrect, said (p. 21, 22) that under the evidence in that case and the charge as a whole defendant was not harmed, as the question there involved was not as to the nature of the homicide but as to the identity of the perpetrator of the crime and whether it was part of a deliberate and premeditated murder or of murder done in the course of a robbery. In the present case, however, the issue was such as to make accuracy in the statement of the law on this point highly important.

A few hours after the death of defendant's wife he visited his mother-in-law's house, where his wife had been living. There were present some of the neighbors, together with his wife's sisters and their friends. The mother-in-law testified that he cursed and said: "I will kill you all." The trial judge charged the jury that, in deciding whether defendant deliberately threw the acid and whether he intended to kill his wife, they might take this threat into consideration. If, however, it be the law, as it is, that the commission of a collateral offense is not admissible in evidence, then certainly the making of a threat to commit a collateral offense is not admissible. For one criminal act to be evidence of another there must be some logical connection between them, either as constituting parts of one transaction, or as showing a common motive or some general design or plan: *Shaffner v. Commonwealth,* 72 Pa. 60, 65; *Commonwealth v. House,* 223 Pa. 487, 492; *Commonwealth v. Winter,* 289 Pa. 284, 290; *Commonwealth v. Luccitti,* 295 Pa. 190, 196. Defendant's alleged threat to kill all the people in his mother-in-law's house, even if seriously made, would not be probative of his intent in previously throwing acid in his wife's face. Even if it were ad-

missible for the purpose of showing that he had a murderous disposition and was a menace to society and therefore to be considered in connection with the question as to the penalty to be visited upon him, the court would have been obliged to caution the jury that its consideration was restricted to that purpose, instead of telling them that they might consider it in order to determine whether he actually threw the acid and with what intent.

The learned trial judge's definition of a reasonable doubt as one "of such substance as, arising in a matter of your own affairs, would cause you to hesitate and reconsider," is criticized by defendant on the ground that the word "affairs" should have been qualified by the word "important." On this point there has been some vacillation in the cases. In *Commonwealth v. Drum,* 58 Pa. 9, the jury were charged (p. 22) : "If the mind be fairly satisfied of a fact, on the evidence—as much so as would induce a man of reasonable firmness and judgment to take the fact as true, and to act upon it in a *matter of importance* to himself, it would be sufficient to rest a verdict upon it." In *Commonwealth v. Andrews,* 234 Pa. 597, it was said (page 608) : "What is to prevent a trial judge from instructing, in the language of Mr. Starkie, that the juror ought not to condemn unless he is so convinced by the evidence that he would venture to act upon that conviction in *matters of the highest concern and importance* to his own interest? Here we have a concise statement of what is implied in the term which brings it clearly to the comprehension of any ordinary mind, and this, or at least its equivalent, expressed in various ways in adjudicated cases, should be made the matter of instruction in every murder trial." On the other hand, in *Commonwealth v. Bryson,* 276 Pa. 566, 573, the court approved a definition of reasonable doubt as one "that would make you hesitate, out in your own everyday life, to believe the existence of anything as a fact, in your *ordinary everyday* affairs, in a matter of

personal concern to yourself." While in *Commonwealth v. Green,* 292 Pa. 579, 591, it was said that a juror should not allow himself "to be controlled by a hesitancy over the decision of a point which he would not consider a matter of doubt or hesitate to decide if it arose in *an affair of importance* to himself," there was a reversion again to the holding in the Bryson case in *Commonwealth v. Barrish,* 297 Pa. 160, 165, where it was held not reversible error to say that a reasonable doubt was such as "would cause a reasonable man in the conduct of his *usual and ordinary* affairs to stop, hesitate and seriously consider as to whether or not he should do a certain thing before finally acting." In *Commonwealth v. Jermyn,* 101 Pa. Superior Ct. 455, Judge GAWTHROP pointed out (p. 474), that "It seems clear that the more weighty or important the affair or question as to which action is to be taken the less substantial is the doubt required to cause hesitation as to it. Therefore, instruction that a doubt that would require an acquittal must be such as would cause hesitation in the weightier affairs of life gives effect to slighter doubt of guilt, and is more favorable to the accused, than instruction that the doubt must be one that would cause hesitation in coming to a decision in the ordinary affairs of life."

It may be doubted if the ordinary juror would appreciate the significance of these distinctions, and whether he would have the capacity to understand and the mental ingenuity to apply them. As a standard and approved form of charge, however, we are of opinion that the jury should be told either, as in the Andrews case, that they should not condemn unless so convinced by the evidence that they would venture to act upon that conviction in matters *of the highest importance* to their own interests, or, as in the Green and Jermyn cases, that a reasonable doubt was one that would cause them to hesitate to act in any of the *important* affairs of their own lives. The one form of charge explains the state of mind that must exist in order to warrant a conviction, the

other the degree of doubt that should lead to an acquittal.

There are other questions raised by appellant which it is unnecessary to discuss.

If defendant deliberately threw this corrosive acid upon the face of his wife, as the evidence would seem almost conclusively to indicate, it was such a cruel and inhuman act that words sufficient to characterize its brutality can scarcely be found. But did he intend to take the life of his victim, and was he therefore guilty of first-degree murder, or did he desire merely to inflict upon her grave bodily harm? For the jury to determine this question properly it was necessary that they should be instructed fully and accurately as to the legal principles designed to guide them in its consideration, but unfortunately there crept into the learned trial judge's charge the defects herein pointed out.

The judgment is reversed and a new trial granted.