481 A.2d 952

**COMMONWEALTH of Pennsylvania**

v.

**George Gregory ORLOWSKI, Appellant.**

Superior Court of Pennsylvania.

Argued May 22, 1984.

Filed Sept. 7, 1984.

602

604

606

John J. Kerrigan, Jr., Newton, for appellant.

Robert E. Goldman, Assistant District Attorney, Doylestown, for Commonwealth, appellee.

Before DEL SOLE, MONTEMURO and HOFFMAN, JJ.

MONTEMURO, Justice:

This is an appeal from a judgment of sentence. The appellant, George Gregory Orlowski, and his co-defendant, Victor Hassine, were tried in the Court of Common Pleas of Bucks County before the Honorable Paul R. Beckert and a jury. The appellant was found to be guilty of the first degree murder [1] of James Puerale, and the attempted murders [2] of Albert "Skip" Kellet, Jr., Lois Kellet and George Sofield, and multiple counts of criminal conspiracy [3] and criminal solicitation. [4]

The jury returned a sentence of life imprisonment on the conviction of first degree murder. Post-verdict motions for a new trial and in arrest of judgment were filed by the appellant, and the issues therein fully briefed and argued to the court. These motions were denied. On January 4,

1. 18 Pa.C.S. § 2502.

2. 18 Pa.C.S. § 901.

3. 18 Pa.C.S. § 903.

4. 18 Pa.C.S. § 902.

1983, the appellant was sentenced to life imprisonment and various concurrent terms of imprisonment. This appeal followed.

The appellant raises several allegations of error which we find to be without merit.

The first of the appellant's grievances to be addressed is his assertion that the Commonwealth failed to produce sufficient evidence to sustain his convictions. If the evidence is insufficient, as alleged, it is a defect in quality, not in quantity, for the Commonwealth spared no effort in the prosecution of this case, producing the testimony of more than thirty witnesses in a jury trial that spanned some nine days and eighteen hundred pages of testimony. Two defects are alleged: the first, that the evidence demonstrated a more compelling motive to kill Kellet on the part of appellant's co-defendant, Vicor Hassine; the second, that the Commonwealth did not sufficiently establish the appellant's criminal liability on either a conspiracy theory or accomplice liability theory because the evidence showed that appellant only wished to have Kellet "beaten up", and not killed.

By whatever selective reading process these arguments were derived, we cannot tell, but our thorough review of the evidence convinces us that the evidence was sufficient to establish each and every element of the crimes for which the appellant was convicted under the standard set forth in *Commonwealth v. Lovette*, 498 Pa. 665, 669, 450 A.2d 975, 977 (1982), *cert. denied, Pennsylvania v. Lovette*, 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983):

> The test for sufficiency of the evidence is whether accepting as true all of the evidence reviewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, the trier of fact could have found that each element of the offenses charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt. [citations omitted].

This tale begins in the remote passages of the appellant's youth and unfolds to a tragic denouement. The appellant was a young boy when he became apprenticed to Albert Kellet, Sr., proprietor of the Kellet Family Market in Fallsington, Bucks County. The appellant was a butcher's boy doing odd jobs and cleaning the market while being taught the intricacies of the trade. He was trained and nurtured by the senior Kellet to such an extent that he was like a member of the family; almost like a brother to Kellet's natural son, Albert, Jr., also known as "Skip." Skip also worked at the family market but growing differences between him and his father caused him to seek employment elsewhere, while the appellant remained.

Since they were reared as brothers, the appellant and Skip had their "good and bad times." It would seem that their situation could be characterized as either fighting or between fights. On several occasions, their fights stemmed from drug deals which had soured.

In 1975, the senior Kellet sold the store. The appellant went with the new owners "like a piece of equipment," and he continued to run the meat department. At some point in the late seventies, the appellant rented the store and operated it himself. He also began operating a small side business—dealing in marijuana and methamphetamine. Coincidentally, Skip Kellet engaged in a similar sideline.

Enter Victor Hassine, the young scion of a wealthy emigre family which had some real estate holdings in the Fallsington area. Moreover, Hassine was the vessel into which three years of legal education had been poured, and so he was entrusted by the family corporation with the management of some of its interests including those in the Fallsington area.

In 1979, Hassine met the appellant and decided to go into business with him. Together they opened a new store in Morrisville, Bucks County, called Greg's Quality Meat Market, which was financed by the Hassine family, overseen by Victor Hassine, and operated by the appellant. For various reasons, the business did not prosper, and soon the appel-

lant began selling marijuana and methamphetamine out of the store to supplement the store's income. The appellant and several employees of the store engaged in the selling. Hassine also began to advise the appellant how to squeeze more profit out of the drug sales.

In early June of 1980, Skip Kellet purchased some methamphetamine from the appellant for one hundred and fifty ($150.00) dollars. Upon bringing the drugs back to his apartment, Kellet discovered the drugs were of an inferior quality and he became enraged. In order to gain revenge on the appellant, he called appellant and told him the drugs were good and he wanted more. The appellant came to Kellet's apartment (where coincidentally appellant had lived for several years prior to Kellet's tenancy) and encountered the enraged Kellet brandishing a cudgel. Kellet threatened the appellant with the club; took the drugs, which appellant had brought with him, and all of appellant's money (either sixty-four ($64) or one hundred and four ($104) dollars); and threw him out of the apartment.

A few days later, a meeting was held at the meat market. Present were the appellant, Hassine, various employees of the meat market, and one William Eric Decker, an itinerant drug fiend and convicted felon, who had been doing labor work for Hassine. Hassine told Decker, in the appellant's presence, that he wanted Skip Kellet killed, or "wasted." Hassine also said that if Kellet's wife, Lois, was there, she "was to go also, because any witnesses had to go." Appellant added that Kellet could be killed at Penn Manor Lakes because he always went fishing there. Appellant also asked one of the employees, Billy Hayes, who lived next door to Kellet, if he could shoot Kellet from Hayes' bedroom window with Hayes' father's gun. Hassine then asked everyone to attempt to procure a gun. The appellant went out and made a phone call, ostensibly to attempt to find a gun, but the party he tried to reach was "sleeping."

Thereafter, Decker accompanied the appellant to the home of one David Evans, a friend of the appellant. Their purpose in going there was to look for a gun. However,

Evans' gun, a hunting rifle, was not suited to their purposes so they did not take it. Decker also accompanied Hassine to the apartment of one Ted Camera, a tenant of a Hassine family apartment in Trenton, to ask for a gun; but again they did not obtain one.

The appellant purchased a .25 caliber automatic handgun from a Tom Easterwood for seventy-five ($75) dollars. Sometime in July, 1980, Hassine gave this weapon to Decker and said, "[h]ere, hit him in the head and leave it there." The gun was test-fired by Hassine and Decker in the back of the market in the presence of appellant and was found to have a defective part.

In late July, 1980, there was a confrontation between Kellet and Hassine in front of one of Hassine's apartments (which was coincidentally across the street from Kellet's apartment). Hassine filed criminal charges of harassment against Kellet. Later a charge of terroristic threats was added when Kellet called the meat market and threatened to burn it down.

On August 1, 1980, Hassine and Decker drove to Edelman's Gun Shop to obtain a part to repair the gun. They did not get the part, but Hassine purchased a box of shells for the gun, for which he signed the register.

Returning from Edelman's, they passed Kellet's apartment, and seeing Kellet, Hassine told Decker to shoot him. Decker demurred because it was daylight, a witness was present and because Hassine was there. Hassine promised Decker that he could have one of Hassine's apartments if he killed Kellet.

On or about August 5, 1980, the appellant and Hassine met with Fred Tuite and Joseph "Critter" Schwab at the appellant's house. Tuite and Schwab were members of the Breed Motorcycle Gang, and Tuite had just been bailed out of jail by Kerry Conklin, a friend of appellant's who frequented the market and also worked as a laborer for Hassine. Tuite had been jailed for offenses relating to the possession of a .357 magnum handgun, which he previously

had attempted to sell to Hassine. Tuite and Schwab were asked by Hassine how much they wanted to kill Kellet. They answered fifteen hundred ($1,500) dollars. The appellant then asked how much to have Kellet beaten up. They answered two hundred and fifty ($250) dollars. At Hassine's direction, appellant left the room and returned with an envelope containing the lesser amount. Tuite and Schwab never did the job.

Thereafter, the appellant told Billy Hayes that Tuite and Schwab were not going to do the job, but rather Eric Decker was designated to kill Kellet. About two and one-half weeks before the shooting, a Paul Koenig, from whom appellant had tried to obtain an unmarked, unregistered handgun, asked appellant if he still needed a gun. Appellant answered "no" that Victor got one. He also said, "We're going to do it Victor's way."

On the evening of August 22, 1980, Kellet and his wife drove to the "Dunkin' Donuts" across the street from appellant's market. Kellet parked the car so that it faced the market. It should be noted that in the period after the drug "rip-off," in addition to the above, there was a continuing pattern of cross-harassment between appellant and Kellet. The appellant saw Kellet, and was worried about his presence. Shortly thereafter, Decker telephoned the market and was told Kellet was there. Decker drove to the market with a friend and after exiting the vehicle, he walked to Kellet's car and sticking his head in the passenger window said, "[a]re you Skipper Kellet?" Kellet answered by exiting his car with a baseball bat in his hand. Decker retreated to his friend's vehicle and then went to the meat market. The appellant unlocked the door and allowed Decker to enter. Decker asked the appellant if Hassine was coming. The appellant said "yes."

Appellant and Decker went to appellant's van which was parked in front of the market and waited for Hassine. Decker said to appellant, "[t]his cat has got to go." Appellant and Decker smoked a marijuana cigarette. Hassine then drove up with his brother, Eli, in a Datsun 280Z.

Decker and the appellant left the van and approached Hassine's car. Decker said, "Tonight's the night—this cat's got to go. We'll use your gun. I want two hundred and fifty dollars." Hassine said he would come back and pick up Decker.

While Hassine was gone, Decker asked appellant for a shirt to cover his tattoos. Appellant gave him a long-sleeve tan shirt that was in the market. Hassine returned about fifteen minutes later. He and Decker left and drove to the house of Hassine's parents in Trenton. While Decker waited in the car, Hassine went inside and obtained his father's .380 Llama handgun. They drove back to Fallsington and Hassine dropped Decker off. Hassine gave Decker a New York Yankees batting helmet to cover his hair. Decker walked up the street, but got lost despite the directions which Hassine had given him. After about twenty minutes, he found Kellet's apartment. Before going there, he went to the apartments owned by Hassine across the street and sat for a few minutes. He then walked across the street to Kellet's. Actually, Kellet and his wife occupied a second floor apartment, but on this evening they were in the first floor apartment of George Sofield. Decker entered through the kitchen and proceeded into the living room—the .380 Llama ready to use. There were four people in the living room watching the Friday night fights—Skip Kellet, Lois Kellet, George Sofield and James Puerale.

As Kellet rose from his chair, Decker fired one shot from the .380 Llama, which struck Kellet in the head, injuring him. Decker turned and fired a shot at Lois Kellet which struck her in the neck and wrist. Decker then shot at Sofield, but missed. Finally, he shot Puerale, an innocent bystander with no connection to the feud between Kellet and appellant. Puerale was killed instantly.

In the interim, Hassine had gone to appellant's house. Appellant and Hassine, and a third person, Michael Thompson, got into Thompson's car. Hassine was carrying a piece of metal pipe approximately twelve inches long. Hassine directed Thompson to drive up and down certain streets

while Hassine whistled out the window. He directed Thompson to stop in the parking lot across from Kellet's apartment. He then directed Thompson to drive to the parking lot of a school behind Kellet's apartment. They then drove to Dunkin' Donuts, where they remained for four or five minutes, until Hassine said, "We've been seen." The men then drove back to Fallsington, and as they were driving along they heard two shots. Hassine stated: "Oh shit, that's my father's gun. I hope that asshole doesn't get caught." The appellant said: "Oh shit, it happened." A few minutes later, Hassine had Thompson stop the car and call, "Eric."

■ The appellant asserts that the evidence was insufficient because it established that his co-defendant Hassine had a stronger motive for killing Kellet than the appellant. The argument, even if it were grounded in fact, provides no basis for granting relief. A joint trial of co-defendants is not a contest to determine who is more culpable. The Commonwealth's object was to prove both defendants' guilt beyond a reasonable doubt. While each, no doubt, had his own motivation for pursuing this course of misconduct, the Commonwealth's proof demonstrated the meshing and intertwining of the motives, such that the culmination of this cabal could only be viewed as being the result of their joint effort.

The appellant also asserts that the evidence was insufficient to convict him because it only indicated that he wanted Kellet "beaten up." Therefore, appellant could not be guilty of murder on an accomplice or conspiracy theory because he did not agree to the object crime. We find, however, that the appellant's argument is belied by the evidence.

■ A person is legally accountable for the conduct of another person when he is an accomplice of that person in the commission of the offense. 18 Pa.C.S. § 306(b)(3). An "accomplice" is defined at 18 Pa.C.S. § 306(c), as:

(c) Accomplice defined.—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

Additionally, a person is guilty of an offense if it is committed by his own conduct or if he is an accomplice of the person who commits it. 18 Pa.C.S. § 306(c), (b)(3). *Commonwealth v. Bradley*, 481 Pa. 223, 392 A.2d 688 (1978), *cert. denied, Bradley v. Pennsylvania*, 440 U.S. 938, 99 S.Ct. 1286, 59 L.Ed.2d 498 (1979); *Commonwealth v. Fields*, 317 Pa.Super. 387, 464 A.2d 375 (1983).

■ The appellant's actions in attempting to procure a weapon, procuring a weapon (although not the one ultimately used) and providing a shirt to cover Decker's tattoos materially aided Decker in perpetrating the shooting and wounding of Kellet and Kellet's wife, and the shooting and killing of Puerale. Clearly, he was an accomplice of Decker's in the commission of these crimes and shares Decker's guilt.

■ Criminal conspiracy is defined at 18 Pa.C.S. § 903(a):

§ 903. Criminal conspiracy

(a) **Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

In the present case, there is ample testimony to establish that the appellant conspired with Hassine and Decker to kill Kellet. He was present at the meeting in early June at which Hassine originally voiced the objective. Although at that meeting and in a later meeting with Tuite and Schwab, appellant raised the possibility of having Kellet "beaten up," his other actions demonstrate his participation in and agreement to the more deadly objective. The appellant suggested killing Kellet at Penn Manor Lakes while Kellet was fishing or shooting him from Billy Hayes' bedroom window. The appellant attempted to procure a weapon from Dave Evans and from Paul Koenig, and did obtain a weapon from Tom Easterwood. The appellant was present when Tuite and Schwab were asked to kill Kellet. The appellant told Billy Hayes that Decker was designated as the shooter. The appellant told Koenig that they would do it "Victor's way." Finally, after Decker was in a confrontation with Kellet, and after Decker said, "that cat has got to go," the appellant gave Decker a long-sleeve shirt to hide Decker's tattoos, and thus avoid identification.

The evidence overwhelmingly leads to the conclusion that the appellant conspired to kill Kellet. There is evidence of an agreement to perform an illegal act. The act being not only the killing of Kellet, but also any witnesses to the crime. Consequently, as a co-conspirator the appellant is criminally responsible for the acts of Decker. *Commonwealth v. Zoller*, 318 Pa.Super. 402, 465 A.2d 16 (1983); *Commonwealth v. Edney*, 318 Pa.Super. 362, 464 A.2d 1386 (1983). The appellant is thus responsible not only for the attempted murder of Kellet, but also the attempted murders of Lois Kellet and George Sofield and the murder of James Puerale. Moreover, as a member of the conspiracy, the appellant is responsible for natural and probable consequences of the commission of the object crimes. *Commonwealth v. Tate*, 485 Pa. 180, 401 A.2d 353 (1979). The killing of eyewitnesses was a natural and probable consequence of the attempted killing of Kellet, especially in light of the conspirator's avowal to do so.

The appellant's second contention is that the lower court erred in denying his motion to suppress statements made at a police interview on the morning following the shootings. He asserts that he was in police custody when he made the statements, but he had never been given the required *Miranda*[5] warnings. He further asserts that the police were aware that he requested an attorney prior to the interview, yet they questioned him anyway and did not allow him to see an attorney. The statements—i.e., a denial that he knew Eric Decker and that he had seen the confrontation at Dunkin' Donuts—were used at trial and appellant asserts they were prejudicial in that they evince a guilty mind.

A suppression court's denial of a suppression motion is reviewed under the following standard:

> Our responsibility on review is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." ... In making this determination, this court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense, as fairly read in the context of the record as a whole, remains uncontradicted.

*Commonwealth v. Kichline*, 468 Pa. 265, 280–281, 361 A.2d 282, 290 (1976) (citations omitted). *See also, Commonwealth v. Lark*, 505 Pa. 126, 477 A.2d 857 (1984).

A suppression hearing was held on March 9, 1981, before Judge Beckert. At that hearing, Bucks County Detective, Steven Battershell; Bucks County Assistant District Attorney, Alan Rubenstein; and Falls Township Police Detective, George Mitchell, testified for the Commonwealth. The appellant offered his own testimony and that of his wife.

■ Based on the testimony presented, an order was issued on March 13, 1981, setting forth findings of fact and conclusions of law and denying the motion to suppress.

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The essence of the order was that at the time of the interview, the appellant was neither in custody nor a suspect, nor the focus of any criminal investigation, and that the appellant's statements were not the product of custodial interrogation.

The evidence adduced at the suppression hearing fully supports the suppression court's findings of fact. Detective Mitchell testified that after the shooting he spoke to Skip and Lois Kellet. Skip Kellet told Mitchell that the shooter was the same individual who had confronted him at the Dunkin' Donuts, in Morrisville, earlier in the evening. Kellet also related that after the confrontation the individual had entered appellant's van. Kellet said to Mitchell, "Go see 'Go For' [appellant]—he has to know who the guy is that shot me." (N.T. 3/9/81 at 215). Detective Mitchell made it clear that at that time Kellet was not accusing appellant of being involved in the shooting. Detectives Mitchell and Battershell both testified that at the time of the interview, the appellant was not a suspect or the focus of any investigation; rather, he was a link to the suspected perpetrator, Eric Decker. At the time of the interview, Decker had not yet been apprehended, nor had he given his statement implicating appellant or Hassine.

Proceeding on the information supplied by Kellet, the police authorities went directly to appellant's house, at 4:45 A.M. on Saturday, August 23, 1980. Detectives Battershell and Mitchell, along with Detective Gourley, Chief Kettler and Officer Feldman were present. The appellant answered the door wearing only a pair of trousers. He was asked to accompany the police to the Falls Township Police Station. Appellant testified that he protested about the time and said he would go later, but was told that he had to go now. Both Detectives Mitchell and Battershell testified that they did not remember the appellant saying anything like this. Detective Battershell testified that he believed that appellant was told at the door of his house that he did not have to go if he did not want to, "[b]ut he volunteered and came down with us." (N.T. 3/9/81 at 170). The

Detective also stated that in the car the appellant was told that he didn't have to talk to the police. *Id.*

At no time was the appellant ever handcuffed or told he was under arrest. The appellant admitted that he was willing to cooperate and would gladly go to the police station; however, he asserted that he had protested because of the time of day.

At the police station, appellant was in a conference room with Detectives Mitchell and Battershell. He was asked about the confrontation between Decker and the Kellets at Dunkin' Donuts. The appellant stated that the previous evening he had been at the market and had seen Skip and Lois Kellet in front of Dunkin' Donuts, but that he had not seen any confrontation. He went on to say that he stayed at the market until about 9:00 P.M., until his partner, Victor Hassine, arrived, that he went home and discussed business with Hassine until about 10:00 P.M. and that he was told about the shooting at approximately 12:00 A.M. by Billy Hayes. Finally, he was shown a picture of Decker. After first denying recognition, appellant stated he had talked to him and seen him on earlier occasions.

At an undetermined time, Eli Hassine arrived at the police station. Hassine told Assistant District Attorney Rubenstein that he was a "Wall Street Lawyer", but that he did not represent anyone. Shortly thereafter, another attorney, Jerrold Kamensky, arrived and asked to see appellant. He was taken to the appellant. After a short discussion between Kamensky and the police, Kamensky told appellant he could leave. The police did nothing to restrain appellant, and he left.

■ Our review of the testimony of the suppression hearing shows that each and every one of the findings of fact of the suppression court is supported by competent evidence of record. Consequently, we need only determine if the court has correctly applied the law in determining whether the appellant was not subjected to custodial interrogation. *Commonwealth v. Jackson*, 497 Pa. 591, 442

A.2d 1098 (1982); *Commonwealth v. Hall,* 475 Pa. 482, 380 A.2d 1238 (1977).

In *Commonwealth v. Bracey,* 501 Pa. 356, 461 A.2d 775, the supreme court stated:

> The *Miranda* warnings and concomitant determination whether a defendant has made a knowing and voluntary waiver of rights are now prerequisites to the admission of a confession only if an individual is "taken into custody or otherwise deprived of his freedom, by the authorities in any significant way and is *subjected to questioning.*" [citation omitted].

*Id.,* 501 Pa. at 366, 461 A.2d at 780. *See also, Commonwealth v. Anderl,* 329 Pa.Super. 69, 477 A.2d 1356 (1984). The determination of whether an individual has been taken into custody is made by ascertaining whether that individual reasonably believes that his freedom of movement is restricted. *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311 (1983); *Commonwealth v. Horner,* 497 Pa. 565, 442 A.2d 682 (1982); *Commonwealth v. Schoellhammer,* 308 Pa.Super. 360, 454 A.2d 576 (1982); *Commonwealth v. Rodriguez,* 327 Pa.Super. 603, 474 A.2d 676 (1984). "[M]ere focus on a subject is not automatically dispositive of custodial status, but the fact that the subject was the focus of the investigation is a relevant factor [in] ... whether the freedom of the subject is restricted or the subject is in custody." *Commonwealth v. Schoellhammer, supra,* 308 Pa.Superior Ct. at 366, 454 A.2d 579.

The appellant's assertion that he was in custody is grounded on the time of day at which the police arrived at appellant's house, and the number of officers that were present. While it cannot be denied that the presence of a number of police officers on one's doorstep at an early hour is disconcerting, it must be remembered that the police proceeded to appellant's home directly after speaking to the Kellets at Lower Bucks County Hospital. While the hour may have been awkward, the police were attempting to locate the suspected perpetrator of an extremely serious crime. Moreover, there was testimony, given credence by

the suppression court, that the appellant was told he did not have to speak to police and that he volunteered to go. The obvious import of these circumstances is that the appellant's initial apprehension had been dissipated by the subsequent dialogue with the police. Under these circumstances, we will not subscribe to the conclusion that appellant reasonably believed he was in custody at the time of the police interview. *Cf. Commonwealth v. Horner, supra; Commonwealth v. Nunez,* 312 Pa.Super. 584, 459 A.2d 376 (1983).

■■■ Our conclusion is supported by the content of the police interview which focused not on the appellant, but rather on Eric Decker.

■■■ Having decided that the appellant was not in custody, nor subjected to custodial interrogation, his contention that any statement given should be suppressed for failure to give *Miranda* warnings is negated. *Commonwealth v. Bracey, supra.*

Finally, the appellant's assertion that the police knew of his request for an attorney and that the police prevented him from seeing an attorney is not supported by the record.

Appellant's third allegation is that the trial court erred in denying his motion to sever. Prior to trial, the appellant asserted that severance of his trial, and that of co-defendant, Victor Hassine, was appropriate because (1) the stronger evidence introduced against his co-defendant would "spill over" and prejudice appellant, and (2) he and his co-defendant had antagonistic defenses.

The standard for reviewing the lower court's determination has been comprehensively set forth by Judge Wieand in *Commonwealth v. Hamm,* 325 Pa.Super. 401, 473 A.2d 128 (1984):

"[Q]uestions of consolidation or severance of defendants for trial rest in the discretion of the trial judge and his rulings on such matters will not be disturbed on appeal except for manifest abuse of discretion." *Commonwealth v. Tolassi,* 258 Pa.Super. 194, 199, 392 A.2d 750,

753 (1978), *aff'd,* 489 Pa. 41, 413 A.2d 1003 (1980). See: *Commonwealth v. Middleton,* 320 Pa.Super. 533, 551, 467 A.2d 841, 850 (1983); *Commonwealth v. Johnson,* 291 Pa.Super. 566, 581, 436 A.2d 645, 653 (1981). When the crimes charged arise from the same acts or series of acts and much of the same evidence is necessary or applicable to all defendants, a joint trial is "permissible, if not advisable." *Commonwealth v. Jackson,* 451 Pa. 462, 464, 303 A.2d 924, 925 (1973). See: *Commonwealth v. Kloiber,* 378 Pa. 412, 415, 106 A.2d 820, 823, *cert. denied,* 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954); *Commonwealth v. Fields,* 317 Pa.Super. 387, 398, 464 A.2d 375, 381 (1983); *Commonwealth v. Norman,* 272 Pa.Super. 300, 306, 415 A.2d 898, 901 (1979); *Commonwealth v. Weitkamp,* 255 Pa.Super. 305, 321, 386 A.2d 1014, 1022 (1978). Especially where a conspiracy to commit crime is alleged, the defendants should be tried together, "unless it can be shown that one or more of the defendants will be actually prejudiced by doing so." *Commonwealth v. Johnson, supra* 291 Pa.Super. at 582, 436 A.2d at 653. See: *Commonwealth v. Katsafanas,* 318 Pa.Super. 143, 161, 464 A.2d 1270, 1277–1278 (1983); *Commonwealth v. Tolassi, supra* 258 Pa.Super. at 200, 392 A.2d at 753. *Id.,* 325 Pa.Superior Ct. at 409–410, 473 A.2d at 132–33. *See also,* 18 Pa.C.S. § 903(d)(1)(i), (ii); Pa.R.Crim.P. 1127A(2).

▆▆ Initially, we note that the appellant herein was charged with a variety of conspiracies wherein the Commonwealth alleged agreement between appellant and his co-defendant to effect the killing of Skip Kellet. Therefore, the appellant and his co-defendant should have been tried together unless some actual prejudice would result.

The appellant asserts several instances of prejudice; however, we find that none of them are meritorious. Appellant alleges that the great amount of testimony presented against his co-defendant "spilled over" and prejudiced him, and in a supporting argument, he points out that a pre-trial habeas corpus petition, which he filed, was granted on the basis that the Commonwealth failed to establish a prima

facie case at appellant's first preliminary hearing. Appellant's argument overlooks the fact that at the initial preliminary hearing only the testimony of Eric Decker, the shooter and co-conspirator, was presented. At trial, the Commonwealth presented the testimony of some thirty-four (34) witnesses (as described more fully herein *supra* at 609–610). The evidence produced implicated both appellant and Hassine in the plot to murder Skip Kellet. We note further that the trial judge took scrupulous care to protect the rights of the respective defendants.

■ The appellant also asserts, in the abstract, that his co-defendant's counsel was able to ask him questions which would have been improper had they been asked by the prosecutor. However, he gives no specific example, nor does he cite to the record to support this assertion, nor is there any indication that the appellant raised any objection to these alleged improprieties at trial. Therefore, we consider this issue to be waived. For the same reasons, we will not consider his assertion that he suffered from dual attacks by the prosecutor and by co-defendant's counsel concerning certain drug transactions between appellant and Kellet—transactions which form the basis of appellant's motive for killing Kellet.

The appellant also asserts that the jury must have been confused by the various, conflicting theories of motive advanced by appellant, his co-defendant and by the Commonwealth. While certainly appellant and co-defendant advanced different theories of motive—each, of course, blaming the other—we do not believe there was any confusion.

The appellant asserted that his co-defendant's motive for attempting Kellet's murder was rooted in the confrontation between Hassine and Kellet on July 26, 1980. Hassine, on the other hand, attempted to demonstrate appellant's more compelling motive based on the drug rip-off.

■ What appellant's argument fails to consider is that the Commonwealth's theory of motive, in line with its conspiracy theory, integrates both incidents in demonstrat-

ing a longstanding feud between Kellet and both appellant and Hassine. It is this theory which the Commonwealth presented to the jury in a complex web of testimony produced by over thirty witnesses. The evidence was undoubtedly complex; however, we perceive no conflict or confusion, and, consequently, find no basis for affording the appellant the relief he seeks.

Finally, appellant asserts that he and his co-defendant had antagonistic defenses. Specifically, he contends that it was his strategy to bolster the credibility of Commonwealth witness, Eric Decker; whereas, it was co-defendant's strategy to impeach Decker's credibility. The appellant alleges that Decker's testimony implicated Hassine, but absolved him.

██ The question of whether antagonistic defenses will entitle two co-defendants to separate trials has had limited discussion in this Commonwealth. *But see, Commonwealth v. Hamm, id.,* 325 Pa.Superior Ct. at 411, 473 A.2d at 133. However, the question has been discussed at length in federal case law. In *United States v. Haldeman,* 559 F.2d 31, 71 (D.C.Cir.1976), *cert. denied, Erlichman v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), the court reiterated the prevailing standard:

While there are situations in which inconsistent defenses may support a motion for severance, the doctrine is a limited one. As set forth in *Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966), the governing standard requires the moving defendant to show that "the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Application of this standard, which is for the District Court in the first instance, and reviewable here only for abuse of discretion, requires that the accounts of co-defendants be not merely divergent from one another but indeed "so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency." To warrant a severance, in short, the

accounts of co-defendants must be "on a collision course." *United States v. Bolden*, 169 U.S.App.D.C. 60, 69, 514 F.2d 1301, 1310 (1975).

Herein, the appellant asserts that the varying treatment of Eric Decker put the co-defendants on a "collision course." We find that this assertion is not supported by the record. In fact, Decker's testimony was strongly indicative of appellant's participation in the conspiracy to kill Kellet. Decker testified that appellant suggested appropriate places and means to kill Kellet, and that appellant attempted to, and did, procure a weapon with which to accomplish the result; although ultimately that weapon was not used.

Consequently, we find no abuse of discretion in the trial court's denial of appellant's motion to sever.

Proceeding to the appellant's other arguments, it is next contended that the trial court erred in instructing the jury in various respects, to wit: (1) defining "reasonable doubt;" (2) failing to vocalize appellant's assertion of Hassine's motive; (3) charging on second degree murder; and (4) failing to give the appellant's requested jury instruction on conspiracy and accomplice liability.

> "It is true that the charge to the jury must be read as a whole in order to determine if it was fair and not prejudicial." *Commonwealth v. Wortham*, 471 Pa. 243, 247, 369 A.2d 1287, 1289 (1977). A court's charge to the jury will be upheld if it adequately and accurately reflects the law and was sufficient to guide the jury properly in its deliberations. *Commonwealth v. Perkins*, 473 Pa. 116, 131, 373 A.2d 1076, 1083 (1977).

*Commonwealth v. Peterson*, 271 Pa.Super. 92, 97–98, 412 A.2d 590, 593 (1979); *Commonwealth v. Stauffer*, 309 Pa.Super. 176, 454 A.2d 1140 (1982).

██ Initially, appellant asserts that the trial court erred in defining "reasonable doubt" for the jury. The trial court charged the jury thusly:

> It is, therefore, obvious that you must understand what we mean by the term "reasonable doubt." By the term "reasonable doubt," we mean a doubt arising from the

evidence, which doubt is substantial, well-founded in reason and common sense and is an honest doubt, being one that springs from a fair, thoughtful and careful consideration of the evidence in the case. A reasonable doubt is not merely a passing fancy that might come into your minds, or a doubt conjured up for the purpose of avoiding an unpleasant duty. It should be such a doubt as would cause a reasonable man in the conduct of his important affairs to stop, restrain himself and seriously consider as to whether or not he should do a certain thing before finally acting. It is something different and more serious than a possible doubt, for in the very nature of human affairs a possible doubt exists in all things.

(N.T. 6/11/81 at 1699). The appellant had submitted a requested point for charge which stated: "A reasonable doubt is a doubt which may cause a person to pause or hesitate before making a decision of some importance in their life." He asserts that the instruction given by the trial judge was erroneous in that it utilized the word "stop", which appellant contends would require a juror to be possessed of a greater quantum of doubt in order to render a decision to acquit than would be required under the generally accepted definition of "reasonable doubt."

In *Commonwealth v. Bryant,* 316 Pa.Super. 46, 462 A.2d 785 (1983), this court said:

Initially, we note that the trial court's charge incorporated both the word "hesitate" and the word "restrain" and that the Pennsylvania Supreme Court has approved both words in jury instructions on reasonable doubt. [Footnote omitted]. *Commonwealth v. Young,* 456 Pa. 102, 317 A.2d 258 (1974); *compare* [*Commonwealth v.*] *Donough* [, 377 Pa. 46, 51–52, 103 A.2d 694, 697 (1954) ] *with Commonwealth v. Kluska,* 333 Pa. 65, 3 A.2d 398 (1939) . . .

Furthermore, since the Pennsylvania Supreme Court has sanctioned both words, this court has repeatedly refused to prefer either word. [citations omitted].

*Id.*, 316 Pa.Superior Ct. at 53, 54, 462 A.2d at 789. Applying this definition to the present case, we find that the trial court's instruction was correct. The appellant would have us read the word "stop" out of context and should we accept that invitation the meaning of the charge would be distorted. The word "stop" must be read along with the accompanying language which modifies it. In fact, what the trial judge said was, inter alia, "a doubt as would cause a reasonable man ... to stop ... *before finally acting."* The meaning of this key phrase "stop ... before finally acting" is essentially the same as the meaning of "hesitate." [6] Consequently, we find no error in the trial court's definition of "reasonable doubt." *Cf. Commonwealth v. Pearson*, 450 Pa. 467, 303 A.2d 481 (1973). (Definition of reasonable doubt as a doubt which would cause one to "halt, hesitate and refuse to take action" found to be proper).

 The appellant also asserts that the trial court erred in refusing to instruct the jury to consider whether Hassine had a motive independent of appellant. The appellant's assertion is contradicted by the transcript:

It has also been brought to my attention that in referring to a motive I—and I think I attributed this to the Commonwealth—that their theory of the motive was the ripoff. I cannot too strongly repeat that it is for you to recall all the testimony. Because I might refer to something, it does not mean something else does not have equal or greater importance. But it has been brought to my attention; therefore, I will say this to you: That there has been another theory of motive presented, and that

6. Webster's Third New International Dictionary (unabridged) defines "hesitate" thusly:

hes-i-tate ... 1 a: to hold back in doubt or indecision: avoid facing a decision, encounter, or problem (the government *hesitated* before each policy) b: to hold back from or as if from scruple ( [hesitate] at treason) 2: to delay usu. momentarily: PAUSE (a glimpse of a deer as it *hesitated* before disappearing into the underbrush) 3: STAMMER [hesitate] vt: to express in a hesitant manner (choose rather to [hesitate] my opinion than to assert it roundly—J.R. Lowell)

was the troubles, or whatever term you want to give to it, that allegedly, according to a portion of this case, existed between Mr. Hassine and Mr. Albert Kellet. This trouble, if you recall, was what brought about the charge of terroristic threats and, I think harassment.

Appellant further asserts that the trial court erred in charging the jury on the elements of second degree murder. At trial, counsel for the appellant excepted to the second degree murder charge generally, but failed to state the grounds for his exception. Consequently, any objection has been waived. Pa.R.A.P. 302(b).

The appellant's final assertion of error on the issue of jury instructions is that the trial judge erred in refusing his instructions on conspiracy and accomplice liability. While the trial court did not use the instructions proferred by the appellant, we find his instructions in these areas were unusually comprehensive. It is evident that the court took painstaking care to properly charge the jury in these respects and did its best to set forth the law clearly and completely. The final product reflects the effort expended. We find no error. (See N.T. 6/11/81 at 1700–1706 and 1711 to 1713).

Appellant next argues that a procedural aberration in the pre-trial proceedings nullified the entire proceeding. His assertion arises out of the appellant's original arrest, release from custody and rearrest. Essentially, he contends that the rearrest was the wrong procedure, and even if it was the correct procedure, it was improperly executed. The relevant facts are as follows:

The appellant was originally arrested on November 25, 1980, and charged with conspiracy, solicitation, criminal homicide and other offenses. On December 3, 1980, he was brought before District Justice Thomas E. League for a preliminary hearing. After hearing the testimony of Eric Decker and a stipulation from the parties concerning testimony from the coroner, District Justice League determined that a prima facie case had been established and held the

matter for court. Thereafter, appellant filed a Petition for Writ of Habeas Corpus with the Bucks County Court of Common Pleas. The Petition challenged the sufficiency of the evidence produced at the preliminary hearing. On December 29, 1980, Judge Beckert issued an order directing that appellant be released from custody for failure of the Commonwealth to make out a prima facie case.

On December 30, 1980, a second criminal complaint was filed charging the appellant with the same offenses. The "affidavit of probable cause" accompanying the second complaint was reinforced by the assertion of Detective Battershall that additional evidence had been received from Billy Hayes and Joseph Schwabb. The appellant was rearrested and a preliminary hearing was held on January 7, 1981. At this hearing, the Commonwealth presented their additional evidence and the appellant was again held for court.

On February 27, 1981, appellant, through counsel, filed his Omnibus Pre-Trial Motion for Relief which asserted, inter alia, by Motion to Quash Informations and by Petition for Habeas Corpus, that the appellant's rearrest was improper because the Commonwealth should have appealed the December 29, 1980, order of Judge Beckert granting appellant's habeas corpus petition instead of rearresting the appellant. He asserted that the Commonwealth's use of the wrong procedure nullified any subsequent proceedings. He further asserted that even if rearrest was a viable procedure, it was invalid because of the way it was carried out. Judge Beckert denied both the motion and the petition. The appellant continues to press his claim, on both grounds, herein. We find no error.

 The appellant's logic roughly follows this line. If a committing magistrate at a preliminary hearing determines that a prima facie case had not been established, the order is interlocutory and the Commonwealth has no right to appeal. *See In Re Riggins*, 435 Pa. 321, 254 A.2d 616 (1969). Consequently, rearrest is the proper procedure to follow. However, if the committing magistrate determines

that a prima facie case is established and holds the matter for court, then a defendant may challenge this determination by Petition for Writ of Habeas Corpus. *Commonwealth v. Orman*, 268 Pa.Super. 383, 408 A.2d 518 (1979). If the writ is issued, and the defendant discharged, then the Commonwealth has a right to appeal. *Commonwealth v. Hess*, 489 Pa. 580, 414 A.2d 1043 (1980); *Commonwealth ex rel. Bryant v. Hendrick*, 444 Pa. 83, 280 A.2d 110 (1971); *Doyle v. Commonwealth ex rel. Davis*, 107 Pa. 20 (1884). The appellant therefore concludes that the taking of an appeal, and not rearrest, is the appropriate procedure following the grant of habeas corpus relief.

The appellant relies principally on *Commonwealth v. Hetherington*, 460 Pa. 17, 331 A.2d 205 (1975). In *Hetherington*, a defendant was arrested and charged by complaint with six different offenses. After a preliminary hearing, the committing magistrate held the defendant for grand jury action on four of the six charges. The defendant filed in the Court of Common Pleas a Motion to Quash [construed by the supreme court as a Petition for Writ of Habeas Corpus] as to the four charges on which he was held. The petition was granted. The Commonwealth filed a petition for rearrest with a second judge in the Court of Common Pleas. The petition stipulated that no more evidence than had been produced at the preliminary hearing would be presented. The second judge refused to entertain the petition "believing that the doctrine of res judicata and the orderly administration of justice precluded one judge of the Court of Common Pleas from reversing the order of another." *Id.*, 460 Pa. at 21, 331 A.2d at 207.

The supreme court held that, with respect to the two charges which were not the subject of the motion to quash, the second judge did not abuse her discretion in refusing to entertain the petition for rearrest because no additional testimony was to be presented; albeit her rationale for doing so was incorrect. The supreme court also held with respect to the four charges which were the subject of the motion to quash that the Commonwealth's failure to appeal

the grant of habeas corpus relief precluded the court from considering the Commonwealth's appeal from the order denying the petition for rearrest.

We find that *Hetherington* is distinguishable from the present case. In *Hetherington,* the Commonwealth by means of the appeal from the denial of the petition for rearrest attempted to obtain review of the exact same determination that had been made in the first instance by the court which granted the motion to quash. It was stipulated that the facts were the same and that no additional evidence was to be presented. Consequently, the Commonwealth was actually seeking to collaterally attack the grant of the motion to quash. Herein, the Commonwealth did not appeal the grant of the writ of habeas corpus. Instead they rearrested the appellant, and at the second preliminary hearing presented additional testimony. The clear import of this action is that the Commonwealth recognized the propriety of Judge Beckert's December 29, 1980, order and realized their case against the appellant was defective. Rather than appeal an order which was correct, they set out to correct that defect in the most expeditious manner available—i.e., the rearrest of the appellant and production of additional evidence to establish the prima facie case.

In this regard, we find this case similar to *Commonwealth ex rel. Fitzpatrick v. Mirarchi,* 481 Pa. 385, 392 A.2d 1346. In that case, the defendant challenged his arrest by means of petition for a writ of habeas corpus. The writ was granted on the basis that the criminal complaint contained a substantive defect which could not be remedied by amendment. The Commonwealth filed a rearrest complaint which corrected the defect in the previous complaint. Although the issue on appeal is not relevant to our discussion herein, we are enlightened by the court's *dicta* which explicates the propriety of the procedure utilized by the Commonwealth:

> This Court has acknowledged that rearrest is the appropriate procedure and the Commonwealth's only recourse

where charges are dismissed and the defendant discharged upon a finding of a lack of a prima facie case since such a determination is interlocutory in nature and, therefore, not appealable. *Commonwealth v. Hetherington*, 460 Pa. 17, 331 A.2d 205 (1975). See also *Riggins Case*, 435 Pa. 321, 254 A.2d 616 (1969); *McNair's Petition*, 324 Pa. 48, 187 A. 498 (1936). Likewise, where, as here, dismissal of the charges and discharge of the defendant resulted from a determination that the complaint contained a "substantive defect", re-arrest was an appropriate, if not the only, procedure available to the Commonwealth.[4] Thus, the court below properly treated this matter as a "re-arrest."

---

[4] Because of defense counsel's use of a writ of habeas corpus to test probable cause to arrest before the preliminary arraignment, the Commonwealth had the option of appealing Judge Mirarchi's grant of habeas corpus to the Superior Court. Act of May 25, 1951, P.L. 415 § 7, as amended, Act of June 3, 1971, P.L. 143, No. 6, § 1, 12 P.S. § 1907. The Commonwealth did not take an appeal, but proceeded by way of re-arrest.

*Id.*, 481 Pa. at 390–391, 392 A.2d at 1348.

The Commonwealth in the present case also opted to rearrest the appellant, rather than file a frivolous appeal. Where the appeal would be frivolous and the Commonwealth is not using the rearrest as a means to circumvent the habeas corpus relief—i.e., additional evidence was presented to establish the prima facie case—we conclude that the rearrest of a defendant is a viable procedure. Consequently, the lower court did not err in denying appellant's motion to dismiss informations or his petition for writ of habeas corpus.

Appellant also asserts, as a fallback position, that the rearrest procedure utilized was improper. He asserts that appellant was entitled to a hearing prior to his rearrest similar to that required by Philadelphia Local Rule 500(H).[7]

7. Philadelphia Local Rule 500(H) states:

(H) *Appeal by Way of Re-Arrest*
When an appeal by way of re-arrest is taken by the Commonwealth, the Judge assigned to the Common Pleas Court Motion Court shall

There is no requirement in Bucks County that the Commonwealth must use the petition and rule proceeding outlined by Rule 500(H). The appellant's reliance on this rule is misplaced. *Cf. Commonwealth v. Cartegena*, 482 Pa. 6, 393 A.2d 350 (1978). Consequently, we find no error in the procedure utilized.

Appellant asserts four additional allegations of error under a general heading of other error. His apparent lack of confidence in these issues is justified since they are without merit.

Appellant first asserts that 18 Pa.C.S. § 906, which forbids multiple convictions for inchoate crimes which culminate in the same offense, precludes the prosecution from pursuing multiple theories of conspiracy [as evidenced by the eight separate informations charging conspiracy] and requires the prosecution to elect pre-trial which theory it will pursue at trial.

■■ Section 906 states simply that "[a] person may not be *convicted* of more than one offense defined by this chapter for conduct designed to commit or to culminate in the commission of the same crime." In *Commonwealth v. Maguire*, 307 Pa.Super. 80, 452 A.2d 1047 (1982), the defendant asserted that this section precluded a verdict of guilty from being returned on more than one inchoate offense. The court rejected the defendant's argument interpreting "convicted," as used in Section 906, as the equivalent of a judgment of sentence. Thus, the court held that Section 906 merely precludes the entry of more than one judgment of sentence where multiple inchoate crimes are charged and multiple guilty verdicts returned. This holding clearly emasculates the appellant's assertion that Section 906 can be used pre-trial.

■■ The appellant also asserts that the court erred in denying his motion for a bill of particulars. Appellant asserts specifically that he was prejudiced because he was

hold the Preliminary Arraignment. The Preliminary Hearing shall likewise be scheduled in the Common Pleas Court Motion Court.

unable to pinpoint dates and places of many of the events relied upon by the Commonwealth to establish a conspiracy. A bill of particulars application is addressed to the trial court's discretion. *Commonwealth v. Scott*, 469 Pa. 258, 365 A.2d 140 (1976); *Commonwealth v. Frye*, 433 Pa. 473, 252 A.2d 580 (1969).

In *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981), the court said:

"A bill of particulars is intended to give notice to the accused of the offenses charged in the indictment so that he may prepare a defense, avoid surprise, or intelligently raise pleas of double jeopardy and the statute of limitations. *Commonwealth v. Simione*, 447 Pa. [473] 474, 291 A.2d 764 (1972). A bill of particulars is not a substitute for discovery and the Commonwealth's evidence is not a proper subject to which a petition for a bill may be directed. *Commonwealth v. Davis*, 470 Pa. 193, 368 A.2d 260 (1977)."

*Id.*, 493 Pa. at 472–473, 426 A.2d at 1114. Herein, the trial court denied appellant's application because the defendant, even in the absence of the information requested, had the benefit of over three hundred pages of transcript from appellant's preliminary hearings, as well as extensive mandatory and discretionary discovery material provided by the Commonwealth pursuant to Pa.R.Crim.P. 305 B. This decision was within the court's discretion, and we find no abuse of that discretion.

The appellant also asserts that the trial court erred in limiting appellant's counsel's cross examination of Commonwealth witness, Fred Tuite, concerning a "fencing" operation Tuite operated in conjunction with co-defendant, Hassine. It cannot be disputed that control of the scope and manner of cross-examination is within the discretion of the trial judge, whose decision will not be disturbed in the absence of an abuse of that discretion. *Commonwealth v. Sisco*, 484 Pa. 85, 398 A.2d 955 (1979); *Commonwealth v. Folino*, 293 Pa.Super. 347, 439 A.2d 145 (1981). The cross-examination sought by appellant would have touched on

criminal activity of Hassine which was irrelevant to the present case. The trial court therefore properly exercised its discretion to limit such cross-examination.

██ Finally, the appellant asserts that the opening and closing speeches of counsel should have been recorded. We note that counsel never requested that the speeches be recorded, nor did he register any objection at the time or in his post-verdict motions. This issue is therefore waived. Pa.R.A.P. 302(a).

Judgment of Sentence Affirmed.